# MATTER OF IZATULA

## In Exclusion Proceedings

## A-29060863

### Decided by Board February 6, 1990

(1) The general rule that prosecution for an attempt to overthrow a lawfully constituted government does not constitute persecution is inapplicable in countries where a coup is the only means of effectuating political change. *Dwomoh v. Sava*, 696 F. Supp. 970 (S.D.N.Y. 1988), followed.

(2) Alien who actively assisted the mujahedin in Afghanistan, and who was sought out by the Afghan regime because of that activity, established a well-founded fear of persecution within the meaning of the Immigration and Nationality Act since there was no basis in the record to conclude that any punishment imposed on the alien would be an example of prosecution for an attempt to overthrow a lawfully constituted government.

EXCLUDABLE: Act of 1952—Sec. 212(a)(19) [8 U.S.C. § 1182(a)(19)]—Fraud or willful misrepresentation of a material fact

Sec. 212(a)(20) [8 U.S.C. § 1182(a)(20)]—No valid immigrant visa

ON BEHALF OF APPLICANT:
John A. Assadi, Esquire
Eleven Penn Plaza, Suite 2101
New York, New York 10001

ON BEHALF OF SERVICE:
Peter Moran
General Attorney

BY: Milhollan, Chairman; Dunne and Heilman, Board Members. Concurring Opinion: Vacca and Morris, Board Members.

This is an appeal from the decision, dated April 3, 1989, in which the immigration judge denied the applicant's requests for relief pursuant to sections 208(a) and 243(h) of the Immigration and Nationality Act, 8 U.S.C. §§ 1158(a) and 1253(h) (1982), and ordered that the applicant be excluded and deported from the United States. The appeal will be sustained.

The applicant is a 23-year-old native and citizen of Afghanistan. The applicant is married, but his wife and son are residing in Afghanistan. The applicant arrived in the United States on January 14, 1989. He was subsequently placed in exclusion proceedings pursuant

to sections 212(a)(19) and (20) of the Act, 8 U.S.C. §§ 1182(a)(19) and (20) (1982). The applicant requested asylum and completed a written application for that relief.[1] The applicant's asylum application was referred to the Department of State Bureau of Human Rights and Humanitarian Affairs ("BHRHA") for an advisory opinion. The BHRHA advised that it "has no factual material about this specific applicant." The BHRHA advised further that information regarding human rights practices in Afghanistan can be found in "the State Department's *Country Reports on Human Rights Practices.*"

At the hearing on the merits of his asylum and withholding requests, the applicant conceded that he was excludable under section 212(a)(20) of the Act. The applicant then presented testimony in support of his applications for relief under sections 208(a) and 243(h). At the conclusion of the hearing, the immigration judge entered his decision finding the applicant exccludable under section 212(a)(20) of the Act and denying him asylum and withholding of deportation.

On appeal, the applicant contends that the immigration judge erred in denying his asylum and withholding of deportation applications. An applicant who seeks relief under section 208(a) may be granted asylum in the exercise of the Attorney General's discretion if that applicant qualifies as a "refugee" within the meaning of section 101(a)(42)(A) of the Act, 8 U.S.C. § 1101(a)(42)(A) (1982). That section, in turn, defines a "refugee" as follows:

> Any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

The applicant bears the burden of proving that he is eligible for relief under section 208(a). *See* 8 C.F.R. § 208.5 (1989).

In order to qualify for withholding of deportation under section 243(h) of the Act, an applicant must show a "clear probability of persecution" if he is returned to a designated country. That is, the applicant must show that it is "more likely than not" that his life or freedom would be threatened in Afghanistan owing to his "race, religion, nationality, membership in a particular social group, or political opinion." *See INS v. Stevic,* 467 U.S. 407 (1984). The applicant also bears the burden of showing eligibility for relief under section 243(h). *See* 8 C.F.R. § 242.17(c) (1989). In *INS v. Cardoza-Fonseca,* 480 U.S. 421 (1987), the Supreme Court held that there is a

---

[1] Pursuant to 8 C.F.R. § 208.3(b) (1989), a request for asylum is also regarded as a request for withholding of deportation under section 243(h) of the Act.

significant difference between the standards for relief under section 208(a) and section 243(h), and that a section 208(a) applicant need not show a likelihood of persecution in order to be eligible for asylum. *See also Carcamo-Flores v. INS*, 805 F.2d 60 (2d Cir. 1986). We stated in *Matter of Mogharrabi*, 19 I&N Dec. 439 (BIA 1987), that an alien can establish eligibility for asylum by showing that a reasonable person in his circumstances would fear persecution in a given country.

The applicant here gave the following testimony in support of his asylum request. He stated that he was raised in Kandahar in Afghanistan, and that he attended school there until 1980, when he was 14 years old. The applicant then began to manage a general store, after his father, who had previously operated the store, retired.

The applicant testified that he avoided the representatives of the Soviet-supported Afghan Army and the KHAD secret police when he was in Afghanistan, because he did not want to be conscripted and forced to fight against his own countrymen. The applicant testified further that between 1985 and 1988, he assisted the mujahedin by providing them with clothes, groceries, and other supplies. He stated that during this period he let his younger brother run the store. The applicant would obtain a list from the mujahedin indicating the items which they needed, and he would then obtain these supplies with the assistance of his brother. The applicant stated that his brother was able to travel freely around Kandahar because he was not old enough for the Army to be interested in conscripting him. The applicant also stated that he himself would deliver supplies to the mujahedin at night, so that he could avoid being seen by members of the Army or other security forces.

The applicant testified further that his brother was arrested by KHAD secret police in October 1988. He stated that someone informed the KHAD police that he and his brother were assisting the mujahedin. According to the applicant, the KHAD agents then came to the store and arrested his brother. The applicant learned from Ijim Mohammad, a man who lived next to the store, that the KHAD agents had asked for the applicant too when they arrested his brother. The applicant stated that he never saw or heard from his brother after the arrest, but he believed that his brother had been imprisoned.

The applicant stated that he hid at home for the 2 days following his brother's arrest. According to the applicant, on the second day that he was in hiding, a KHAD agent came to the house looking for him. The applicant's father told the KHAD agent that he did not know where the applicant was, and the agent "beat ... up" the applicant's father. The applicant stated that after the KHAD agent had left his home, he went to a village named Arghandab which is approximately 2 kilometers from Kandahar. The applicant's father moved with him to

Arghandab, which was an area under mujahedin control. The applicant also stated that his uncle informed him that KHAD agents continued to look for him at his house in Kandahar after he had fled to Arghandab.

The applicant remained in Arghandab for 1 1/2 months. He fled Arghandab because of the "constant bombardment" there, and because his father was injured during an air raid near the house where the applicant and his father were living. The applicant travelled to Pakistan along with 9 or 10 members of the mujahedin. After he had arrived in Pakistan, the applicant stayed in Chaman for 3 days. He subsequently travelled to Karachi, where he remained for 20 days. In Karachi, the applicant paid a fee to an agent who provided him with a passport and a boarding pass. The applicant testified that he made arrangements to leave Pakistan because he had no family ties there, and because he could not afford to continue to pay for the hotel where he was staying in Karachi.

Finally, the applicant denied that he had displayed a fraudulent passport to examining immigration officers in this country. The applicant stated that he showed only his boarding pass to these officers, and that he immediately requested asylum. The applicant also stated that his father-in-law is in a lawful immigration status in this country.

The immigration judge based his denial of the applicant's asylum request on two separate grounds.[2] He found first that the applicant's fear of being conscripted by the pro-Soviet Afghan Army was no longer a valid basis for a persecution claim, due to the Soviet forces having withdrawn from Afghanistan in February 1989. Concerning the applicant's active support of the mujahedin, the immigration judge found that the applicant's fear of harm from the Afghan Government relates to "an act of prosecution rather than act of persecution for aiding groups in opposition in an attempt to overthrow the defacto [sic] government of Afghanistan."

We concur with the immigration judge's reasoning that the applicant is not eligible for asylum based on an unwillingness to perform military service in Afghanistan. Since the Soviet forces have withdrawn from Afghanistan, an asylum claim based on a refusal to serve in the Afghan military is no different than any other alien's claim that he will be punished because he did not serve in his country's armed

---

[2]The immigration judge did not comment on the issue of the applicant's credibility but appears to have accepted the applicant's testimony as credible. Furthermore, because he concluded that the applicant had not met his burden of demonstrating statutory eligibility for asylum, the immigration judge did not address the issue of whether the applicant warrants a favorable exercise of discretion.

forces. *See Matter of Vigil*, 19 I&N Dec. 572 (BIA 1988); *see also Matter of Salim*, 18 I&N Dec. 311 (BIA 1982), *modified by Matter of Canas*, 19 I&N Dec. 697, at 709 n.11 (BIA 1988), *and Matter of A-G-*, 19 I&N Dec. 502, at 506 (BIA 1987), *aff'd sub nom, M.A. v. INS*, 899 f.2d 304 (4th Cir. 1990).

We do not agree, however, with the immigration judge's rationale that the applicant would be subject to prosecution in Afghanistan due to the assistance which he rendered on behalf of the mujahedin. The applicant established through his testimony that his brother was arrested, and not heard from again, because of his support for the mujahedin. He further established that the authorities sought him out too because he had assisted the mujahedin.

The BHRHA advisory opinion in the record makes reference to the Department of State's 1988 Country Reports on Human Rights Practices, Joint Committee of the Senate and House of Representatives, 101st Congress, 1st Session (1989) [hereinafter "Country Reports"]. The Country Reports provide the following concerning the Afghan Government's treatment of suspected political opponents:

> Regime authorities frequently employ torture to punish or to extract information or confessions. The policy is widespread, indicating that it has official sanction. Victims often claim that Soviet officials monitor and indirectly control the torture sessions. Torture techniques include both physical and psychological abuse. Use of electric shock to sensitive parts of the body, immersion in water, and beatings are common forms of physical abuse reported by victims and witnesses. Threats of abuse against family members and prolonged sleep deprivation are typical forms of psychological abuse. Persistent reports describe cases of mental disturbances induced by torture in regime prisons. Political prisoners are usually not segregated from criminal or mentally ill prisoners. Medical care is commonly described as minimal at Pol-e-Charkhi, where prisoners are generally required to wait at least a month before being allowed access to medical personnel. According to reliable reports, many prisoners died in 1988 as a result of inadequate diet, corporal punishment, and torture.

*Id.* at 1269. Furthermore, the Country Reports estimate that there are "at least several thousand" political prisoners being held in Afghanistan. *Id.* at 1271. The Immigration and Naturalization Service has submitted no evidence to rebut the information in the Country Reports concerning human rights conditions in Afghanistan. Thus, we find that the applicant has demonstrated that he is at risk of imprisonment, at a minimum, in Afghanistan because of his political activity there.

Moreover, we find no basis in the record to conclude, as the immigration judge did, that any punishment which the Afghan Government might impose on the applicant on account of his support for the mujahedin would be an example of a legitimate and internationally recognized government taking action to defend itself from an armed rebellion. The Country Reports explain that in Afghanistan,

"[c]itizens have neither the right nor the ability peacefully to change their government. Afghanistan is a totalitarian state under the control of the [People's Democratic Party of Afghanistan], which is kept in power by the Soviet Union." Country Reports, *supra*, at 1273. We accordingly find the existing political situation in Afghanistan to be different from that of countries where citizens have an opportunity to seek change in the political structure of the government via peaceful processes. *See Dwomoh v. Sava*, 696 F. Supp. 970, 979 (S.D.N.Y. 1988) ("general rule [that] prosecution for an attempt to overthrow a lawfully constituted government does not constitute persecution ... [is not] applicable in countries where a coup is the only means through which a change in the political regime can be effected"). Therefore, because we find that the applicant has established that he is at risk of being punished for his political activities in Afghanistan, and because there is no basis in the record to conclude that any punishment imposed by the Afghan Government would be a legitimate exercise of sovereign authority, we conclude that the applicant has established a well-founded fear of persecution in Afghanistan. A reasonable person in the applicant's position would fear persecution in Afghanistan within the meaning of the Act. *Matter of Mogharrabi, supra.*

The remaining issue in this case is whether the applicant warrants a favorable exercise of discretion. We note that the applicant denied that he sought to enter the United States by fraud, and the Service did not submit any evidence regarding this issue.[3] There is also no indication in the record that the applicant had permission to work or to remain in Pakistan. The applicant established that he has at least one relative in a lawful immigration status here. As there are no adverse factors in his record, we find, considering the totality of the circumstances, that the applicant's asylum application should be approved as a matter of discretion. *See Matter of Pula*, 19 I&N Dec. 467 (BIA 1987).

Because the applicant will be granted asylum, we need not address the issue of the applicant's eligibility for withholding of deportation. *See Matter of Mogharrabi, supra,* at 449. Accordingly, the following orders will be entered.

**ORDER:** The appeal is sustained and the decision of the immigration judge denying the applicant's request for asylum is reversed.

**FURTHER ORDER:** The applicant is granted asylum pursuant to section 208(a) of the Immigration and Nationality Act, as amended, and the proceedings are terminated.

---

[3] As stated above, the immigration judge found the applicant to be excludable only under section 212(a)(20) of the Act.

*CONCURRING OPINION*: Fred W. Vacca, Board Member

I respectfully concur.

The applicant in these exclusion proceedings contends on appeal that he has a well-founded fear of persecution in Afghanistan for essentially two reasons. The first being that he would be persecuted by the Afghan Government because of his unwillingness to serve in the army. The second reason is that he would be persecuted by the Afghan Government because of his assistance in furnishing supplies to the mujahedin rebels in that country.

As to the first contention, I take administrative notice of the withdrawal of the Soviet occupation forces from Afghanistan. The conflict that now exists in Afghanistan is in the nature of a civil war in which the Government established during the Soviet occupation of Afghanistan is in armed conflict with various rebellious factions seeking to overthrow that government. Therefore, the conclusion reached by a majority of the members in *Matter of Salim*, 18 I&N Dec. 311 (BIA 1982), is not applicable to the facts of this case. In the absence of a Soviet-dominated Afghan army, the applicant's refusal to perform military service in Afghanistan is indistinguishable from the refusal of a citizen of any sovereign nation to serve in its armed forces. Thus, the applicant's expressed unwillingness to serve in the Afghan Army may not be a predicate for a well-founded fear of persecution. In *Matter of A-G-*, 19 I&N Dec. 502 (BIA 1987), the Board affirmed the long-accepted position that it is not persecution for a country to require military service of its citizens. Accordingly, I concur in the finding of the majority as to this point.

Where I disagree pertains to the applicant's contention that he would be persecuted because of his assistance to mujahedin rebels when he resided in Afghanistan. Specifically, the majority takes issue with the immigration judge's finding that the applicant's assistance to the mujahedin may result in his prosecution for criminal violations if he were to be returned to Afghanistan. The majority reasons that the assistance in furnishing supplies to the mujahedin was a political activity, that the applicant's brother was imprisoned by the Government for the same activity, and that in view of the thousands of Afghans who are imprisoned for political activity, the applicant "is at risk of imprisonment at a minimum." The majority rationalizes that "there is no basis in the record to conclude that any punishment imposed by the Afghan Government would be a legitimate exercise of sovereign authority...." In effect, the majority finds that the Afghan Government is illegitimate and therefore incapable of imposing a lawful punishment. This finding is based upon the notion that any government that does not provide for political change through

155

democratic and peaceful processes cannot defend itself against armed rebellion, insurrection, and coup d'etat without engaging in persecution.

In its broadest ramifications, the majority wades in dangerous waters when it presumes to make judgments as to the legitimacy of sovereign nations by scrutinizing their political systems. Clearly, the President of the United States has constitutional authority to formulate and conduct foreign policy and does so through the Secretary of State and the Department of State. The Board, however, as a delegate of the Attorney General, has no authority to make pronouncements concerning the legitimacy of sovereign nations. Just as treason, insurrection, and providing aid and comfort to the enemy are punishable crimes under the political system of the United States, these acts are most probably punishable crimes in Ghana, El Salvador, Afghanistan, and almost all countries of the world. To hold that some governments may create laws affecting crimes, adjudicate criminal cases, and impose punishments upon offending citizens and other governments may not depending upon the nature of their political systems is patently absurd. The right of all nations to recruit soldiers and maintain armies to protect themselves from enemies within or without their borders is recognized as fundamental in international law. This sovereign right is not limited to countries whose internal political structures are democratic. If a totalitarian government prevents violent overthrow of its government, then the perpetrators of the failed coup are subject to the criminal laws of that government notwithstanding the fact that due process as we know it may not exist in that country.

To the extent that the majority espouses the view of the district court in *Dwomoh v. Sava*, 696 F. Supp. 970, 979 (S.D.N.Y. 1988), to the effect that the issue of prosecution versus persecution is determined by whether a sovereign nation conducts free national elections and accords its defendants in criminal proceedings due process rights, I disagree.

To focus, as the majority does, on the political system of a country in order to determine whether it engages in persecution or prosecution is erroneous and serves no useful purpose. In my view, the issue is whether the punishment the applicant faces for assisting the mujahedin is, in fact, persecution on account of political opinion. As pointed out in the Office of United Nations High Commissioner for Refugees, *The Handbook on Procedures and Criteria for Determining Refugee Status Under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees* (Geneva, 1988), persons fleeing from prosecution are not normally refugees. *Id.* at 15. However, prosecution for an offense may be a pretext for punishing an individual for his political

opinion. Therefore such factors as the nature of the crime and the severity of the punishment vis-a-vis the crime committed should be considered. *Id.* at 15-16. Moreover, in order to determine if the offender can be considered a refugee, the Board should also consider his political opinion, the motive behind his actions, the nature of the act committed, the nature of the prosecution and its motives, and the nature of the law on which the prosecution is based. *See id.* at 20-21.

Under the facts of this case, it is apparent from the applicant's uncontroverted testimony that he supplied various goods to the rebels in Afghanistan. The mujahedin initially fought to repel the invading Soviet Army and its Afghan Army surrogates. After the Soviet Army's withdrawal, the rebel factions sought to overthrow the Afghan Government and overcome the Afghan Army. The rebels' objectives were and still are military and political. The applicant assisted the rebels' cause by furnishing tangible support for their fighting force. The nature of his "crime" is obviously political and his motivation was clearly political. His crime was that of aiding the Government's enemy and the prosecution while criminal in nature is entwined with the political objectives of the Government. In Afghanistan prisons and detention camps, political prisoners are routinely tortured, deprived of adequate food and medical care, and suffer corporal punishment.[1] I find it reasonable to conclude that if the applicant were convicted for his crime and incarcerated he would suffer punishment disproportionate to his crime. Under these circumstances, his punishment would be in the nature of persecution. Therefore, I conclude that the applicant has a well-founded fear of persecution and is statutorily eligible for the relief of asylum. I also would grant him this relief in the exercise of administrative discretion for the reasons stated in the majority's decision. Accordingly, I would sustain the applicant's appeal and reverse the decision of the immigration judge as to his asylum claim for the foregoing reasons. For the reason stated by the majority in its decision, I do not address the issue of the applicant's eligibility for withholding of deportation.

*CONCURRING OPINION:* James P. Morris, Board Member

I concur in the foregoing opinion.

---

[1] 1988 Country Reports on Human Rights Practices, Joint Committee of the Senate and House of Representatives, 101st Congress, 1st Session (1989).