NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 06a0341n.06
Filed: May 12, 2006

No. 05-3300

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| **ALASSANE NDIAYE**, | ) | |
| | ) | ON APPEAL FROM THE |
| *Petitioner,* | ) | BOARD OF IMMIGRATION |
| | ) | APPEALS |
| v. | ) | |
| | ) | **O P I N I O N** |
| **ALBERTO R. GONZALES, Attorney General,** | ) | |
| | ) | |
| *Respondent.* | ) | |

BEFORE:    KEITH and COLE, Circuit Judges; MILLS, District Judge.[*]

**R. GUY COLE, JR., Circuit Judge.**  Petitioner Alassane Ndiaye, a native of the Central African Republic, appeals the order of the immigration judge (IJ) denying him asylum, withholding of removal, and relief under the Convention Against Torture (CAT).  For the following reasons, we affirm the denial of Ndiaye's request for asylum and withholding of relief, but we reverse the IJ's determination that Ndiaye is not entitled to relief under the CAT, and remand to the IJ for further proceedings.

## I.

Alassane Ndiaye is a native of the Central African Republic, and resided in the city of Bangui.  Ndiaye is Fulani Bororu, a sub-tribe of the Fulani tribe.  While Ndiaye lived in Bangui, his

---

[*]The Honorable Richard Mills, United States District Judge for the Central District of Illinois, sitting by designation.

youngest brother, Amadu, was active in the Rassemblement Democratique Centrafricain (RDC) political party. Ndiaye became involved through his brother. Although Ndiaye testified that he became active in the RDC in 1996, the secretary to Andre Kolingba – Central African Republic's former president – wrote a letter stating that Ndiaye had been a member since 1988. Ndiaye testified that the letter had confused him with Amadu. Ndiaye testified that he frequently gave the party money and cattle, and started attending meetings when his brother began encouraging him to do so, with the hope that Ndiaye's prominent economic status in the community would prompt others to attend as well.

The RDC gained power in 1982. In 1993, elections were held, resulting in Kolingba's defeat. Ange Felix Patasse, who won the 1993 election, won a subsequent election. On May 28, 2001, Kolingba attempted to regain power via a coup, which failed.

Ndiaye testified that on May 29, government officials came to his house and arrested his brother Amadu. Ndiaye testified that he was not home at that time. Ndiaye testified that on the next day, May 30, he too was arrested at his shop by the President's security staff. He testified that as he was being pulled out of his store and placed in a vehicle, the security staff made comments about the fact that he was Fulani, and the fact that he gave money to Kolingba. They said that the money was being used to buy weapons, which in turn were being used to overthrow the government. Ndiaye testified that he was placed in a vehicle and taken to Ngaragba prison in Bangui. On cross-examination, which emphasized that Ngaragba was destroyed in 1996 and did not begin accepting prisoners again until October 2002, Ndiaye testified that he was held in one of the rooms that was not destroyed.

Ndiaye testified that once he reached Ngaragba prison, he was required to remove his clothing, and was beaten. Ndiaye testified that the guards administered electric shocks all over his body, including his genitalia. His abusers commented that he was giving the RDC money and cattle. They asked him for the name of another political group in which members of the RDC had been involved. They also specifically asked him about Amadu. Ndiaye told his abusers that he did not know anything. He also admitted to giving the RDC money and cattle, although he told them that he did not intend for the RDC to use his donations to overthrow the government.

Ndiaye testified that he was eventually returned to his cell, where the food was inedible and he was unable to get enough sleep. Ndiaye testified that beatings and electric shocks happened frequently, and correlated with those times when he was moved out of his cell for the purposes of interrogation.

Ndiaye testified that when he had been held in the prison for just over eight months, guards beat him badly, although Ndiaye did not tell the guards his name. Ndiaye testified that one of the guards with whom he was "close" then told Ndiaye that the guards had a list with the names of people to be killed, and that Ndiaye's name was on the list. Ndiaye testified that the guard told him that because Ndiaye did not reveal his name to the guards, he was not killed. Ndiaye testified that the guard with whom he was close agreed to help him escape the prison in exchange for ten cattle. The guard facilitated the removal of Ndiaye's name from the list of those to be executed, and released Ndiaye during a feigned trip to court on February 10, 2002. The guard ultimately took 17-18 cattle.

After escaping, Ndiaye stayed with a relative in Bangui. His relative was afraid, and so only let Ndiaye stay with him for a couple of months. While staying with his relative, Ndiaye learned that the government had taken some of his cattle, and that his family had left their village. Ndiaye's home and store were looted. Upon leaving Bangui, his family went to Cameroon, and are currently in Senegal.

Ndiaye left the Central African Republic in April 2002. His relative with whom he was hiding placed Ndiaye in touch with a businessman, who gave Ndiaye a Senegalese passport and ticket in exchange for eight million centime. After being routed through Cameroon and Senegal, Ndiaye arrived in New York on May 11, 2002. Ndiaye then traveled to Memphis by bus. After contacting the aforementioned relative in Bangui to tell him he was seeking asylum in the United States, his relative told him that government officials were looking for him in the Central African Republic, and that he would be in danger if he returned. Ndiaye asked him to send any documents the relative had that concerned him; Ndiaye received summonses (calling Ndiaye to Ngaragba) and arrest warrants that were issued during the period Ndiaye testified he was in Ngaragba prison, as well as a certificate of residence, which attests to the fact that Ndiaye lived in Bangui on the date of issuance. The certificate of residence was issued in August 2002, after Ndiaye had left for the United States. In response to questions regarding the summons issued while Ndiaye was detained, he replied "[t]hey just tried to plan something on me." Ndiaye testified that he did not want to return to the Central African Republic, because he believes he will "be in trouble."

The IJ denied Ndiaye's application for asylum, for withholding of removal and for relief under the CAT. As for asylum, the IJ determined that Ndiaye was not credible, and even if credible,

he had not demonstrated a well-founded fear of future persecution. The IJ determined that Ndiaye had not demonstrated eligibility for withholding of removal, nor had he demonstrated that it was more likely than not that he would be tortured as required under the CAT. The Board of Immigration Appeals affirmed the IJ's ruling in a per curiam decision. This timely appeal follows.

**II.**

When the BIA summarily upholds the IJ's decision, as happened here, this Court reviews the IJ's decision. *Denko v. INS*, 351 F.3d 717, 723 (6th Cir. 2003). We must uphold the IJ's factual findings if those findings are supported by "reasonable, substantial, and probative evidence on the record considered as a whole." *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992) (quoting 8 U.S.C. § 1105a(a)(4)). We have previously held that an IJ's factual findings are "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." *Yu v. Ashcroft*, 364 F.3d 700, 702 (6th Cir. 2004) (quoting 8 U.S.C. § 1252(b)(4)(B)). We review the IJ's legal conclusions *de novo*. *Tapucu v. Gonzales*, 399 F.3d 736, 738 (6th Cir. 2005)

**A.      Asylum and Withholding**

Ndiaye appeals the IJ's decision denying him asylum and withholding. In denying Ndiaye relief, the IJ determined that Ndiaye was not credible, and that even if Ndiaye were to be found credible, he failed to establish a well-founded fear of persecution.

**1.      Credibility**

Credibility determinations are findings of fact, and are thus reviewed under the substantial evidence test. *Yu*, 364 F.3d at 703. Thus, the IJ's credibility determination is "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C.

1252(b)(4)(B). Ndiaye argues that the IJ erred as a matter of fact in concluding that he was not credible, because the discrepancies upon which the IJ relied in making such a determination are minor. An adverse credibility determination cannot be based on an inconsistency that does not go to the heart of his application. *Sylla v. INS*, 388 F.3d 294, 296 (6th Cir. 2004). An adverse credibility determination "cannot be based on an irrelevant inconsistency." *Daneshvar v. Ashcroft*, 355 F.3d 615, 619 n.2 (6th Cir. 2004). If the inconsistencies "cannot be viewed as attempts by the applicant to enhance his claims of persecution, they have no bearing on credibility." *Id.* (quoting *Shah v. INS*, 220 F.3d 1062, 1068 (9th Cir. 2000)).

The IJ determined that Ndiaye was not credible for several reasons, including the fact that the Central African Republic issued warrants of arrest and summonses to give testimony during the period that Ndiaye claimed to be in government custody. Ndiaye argues that the IJ erred insofar as he found a tension between Ndiaye's imprisonment and the warrants and summonses, and maintains that the warrants and summonses were a result of the Central African Republic's inefficiency and lack of coordination, for which he should not be prejudiced. He further argues that the discrepancy between his testimony regarding his imprisonment and the warrants and summonses should not bear upon his credibility, because Ndiaye's testimony was not an attempt to enhance his claim of persecution. Contrary to Ndiaye's position, however, the discrepancy between his testimony and the summons could reasonably be seen as an attempt to enhance his claim of persecution. Furthermore, Ndiaye's testimony does not provide the compelling evidence necessary to reverse the IJ's negative credibility determination.

## 2. Well-Founded Fear of Persecution

In order to be eligible for asylum, a petitioner must establish that he or she has suffered past persecution or has a fear of future persecution. 8 C.F.R. § 208.13(b). If a petitioner demonstrates past persecution, there is a rebuttable presumption that the petitioner has a well-founded fear of persecution in the future. 8 C.F.R. § 208.13(b)(1)(I). Ndiaye argues that the district court erred insofar as it did not find that Ndiaye proved past persecution. Thus, Ndiaye argued, this Court should find that Ndiaye sufficiently established past persecution, and as such, should credit Ndiaye with the presumption that he has a well-founded fear of future persecution.

The IJ held that even if fully credible, Ndiaye had not met his burden of demonstrating that he had a well-founded fear of persecution, based on its determination that Ndiaye was taken into custody after the former president staged an attempted coup. The IJ concluded that the Central African Republic had the right to defend itself from an armed rebellion. *Id.* (citing *Matter of Izatula*, 20 I. & N. Dec. 149, 153 (BIA 1990)). Although the IJ most likely erred in failing to consider whether Ndiaye was persecuted based *both* on imputed political opinion and political revenge, *see Lim v. INS*, 224 F.3d 929, 934 (9th Cir. 2000) ("[E]xtortion motivated partly by greed could qualify as persecution on account of political opinion, provided that the extortion had a *partly* political motivation."), *Luna-Castro v. INS*, 1 F. App'x 625, 627 (9th Cir. 2001) ("Evidence of 'political revenge' may be sufficient to show persecution on account of imputed political opinion."), because we cannot disturb the IJ's adverse credibility determination, Ndiaye would not be entitled to asylum relief even if the record establishes a well-founded fear of persecution.

3.      **Eligibility for Withholding of Removal**

Next, Ndiaye argues that the IJ erred insofar as he determined that Ndiaye had not met the burden of proof for withholding of removal. In order to be eligible for withholding of removal, Ndiaye must establish that his "life or freedom would be threatened in the proposed country of removal on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 C.F.R. § 208.16(b). An application seeking withholding of deportation faces a more stringent burden of proof than one for asylum. *INS v. Cardoza-Fonseca*, 480 U.S. 421, 431-32 (1987). In order to be entitled to withholding of deportation, Ndiaye must demonstrate that there is a clear probability that he would be subject to persecution if he were to return to the Central African Republic. *See Mikhailevitch v. INS*, 146 F.3d 384, 391 (6th Cir. 1998). The IJ concluded that Ndiaye had not met his burden. It held that Ndiaye's testimony was self-serving, did not establish that he was tortured, and did not establish that it is more likely than not that he will be tortured. The IJ's conclusions are largely based on its negative credibility determination. Because Ndiaye has failed to establish his eligibility for asylum, "'it therefore follows that he cannot satisfy the more stringent standard for withholding of removal' as well." *Vasha v. Gonzales*, 410 F.3d 863, 875 (6th Cir. 2005) (citing *Koliada v. INS*, 259 F.3d 482, 489 (6th Cir. 2001)).

**B.     Convention Against Torture**

Finally, Ndiaye argues that the IJ erred insofar as he determined that Ndiaye was not eligible for relief under United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, December 10, 1984, S. Treaty Doc. No. 100-20, 1465 U.N.T.S. 85 (hereinafter, "CAT"), *implemented by* Foreign Affairs Reform and Restructuring Act of 1998, Pub.L. No. 105-277, Div. G., Tit. XXII, § 2242, 112 Stat. 2681-822 (codified at 8 U.S.C. § 1231

note). Article 3(1) of the CAT provides that "[n]o State Party shall expel, return ('refouler') or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture." In order to be entitled to relief under the CAT, a petitioner must demonstrate that "it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 208.16(c)(2). Ndiaye is not required to prove that the reason behind such torture would be political. *See Ali v. Reno*, 237 F.3d 591, 596 (6th Cir. 2001). Because judicial review of a claim brought pursuant to the CAT is only available when the claim is heard as part of the final order of removal pursuant to 8 U.S.C. § 1252, the applicable standard of review requires that "a decision that an alien is not eligible for admission to the United States is conclusive unless manifestly contrary to law," and "the administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." *Id*. (quoting 8 U.S.C. § 1252(b)(4)(B) and (C)).

That Ndiaye is not eligible for asylum and withholding of removal does not bar his claim under the CAT. *See Yang v. U.S. Dept. of Justice*, 426 F.3d 520, 523 (2d Cir. 2005); *Settenda v. Ashcroft*, 377 F.3d 89, 94 (1st Cir. 2004); *Zubeda v. Ashcroft*, 333 F.3d 463, 476 (3d Cir. 2003) (holding the that BIA over-relied on adverse credibility determination and failed to consider evidence of the relevant country conditions in evaluating claim under the CAT); *Kamalthas v. INS*, 251 F.3d 1279, 1280 (9th Cir. 2001); *Mansour v. INS*, 230 F.3d 902, 908 (7th Cir. 2000) ("We are not comfortable with allowing a negative credibility determination in the asylum context to wash over the torture claim.").

The IJ's denial of CAT relief was based entirely on his adverse credibility determination. Referring to the State Department report on the Central African Republic, *Central African Republic: Country Reports on Human Rights Practices,* 2002 (March 31, 2003) ("Country Report"), the IJ determined:

> While the Country Report shows that the Central African Republic has a poor human rights record, this is not tantamount to a grant of Torture Convention withholding, since respondent has not shown anything beyond his self-serving testimony to show injury or, that is, to show evidence that he was tortured, or to show evidence of torture.

Although the Country Report does not indicate that all persons within the Central African Republic will be subject to torture, the Country Report explicitly states that police "continue to torture, beat and otherwise abuse criminal suspects, detainees, and prisoners." The record contains several warrants issued for Ndiaye's arrest. The IJ does not purport to discredit the veracity of those documents; to the contrary, the IJ cites those documents as justification for discrediting aspects of Ndiaye's testimony with which they conflict. To the extent that Ndiaye's status as a criminal suspect has not changed, the record supports a finding that it is more likely that not that Ndiaye will be tortured if forced to return to the Central African Republic. For that reason, we remand this case to the IJ to determine whether Ndiaye is entitled to relief under the CAT, notwithstanding the IJ's adverse credibility determination. *See Zubeda*, 333 F.3d 478-79 (remanding to the IJ for a proper determination of entitlement to CAT relief).

### III.

For foregoing reasons, we AFFIRM the IJ's order denying Ndiaye asylum and withholding of removal. We REVERSE the IJ's determination that Ndiaye is not entitled to relief under the

CAT, and REMAND to the IJ for further proceedings consistent with this opinion, including whether Ndiaye is entitled to relief under the CAT based on Ndiaye's status as a criminal suspect in the Central African Republic.