05-6185-ag
Vumi v. Gonzales

**UNITED STATES COURT OF APPEALS**

**FOR THE SECOND CIRCUIT**

_____

August Term, 2006

(Argued:  March 15, 2007                    Decided:  August 31, 2007)

Docket No. 05-6185-ag

_____

LULUENGISA CHANTAL VUMI

*Petitioner*,

v.

ALBERTO GONZALES

*Respondent*.

_____

Before: CALABRESI, WESLEY, *Circuit Judges*, SESSIONS, *District Judge*.[*]

_____

On petition for review of an order of the Board of Immigration Appeals ("BIA"). The petition for review is GRANTED, the order of the BIA is VACATED, and the case is REMANDED to the BIA for further proceedings.

_____

JON BAUER, Asylum and Human Rights Clinic, University of Connecticut School of Law, Hartford, CT, *for Petitioner*.

NORA R. DANNEHY, Assistant U.S. Attorney, *for* KEVIN J. O'CONNOR, U.S. Attorney for

[*]The Honorable William K. Sessions III, of the United States District Court for the District of Vermont, sitting by designation.

the District of Connecticut, New Haven, CT, *for Respondent*.

DEBORAH ANKER, Harvard Immigration and Refugee Clinic (Nancy Kelly and John Willshire-Carrera *on the brief*), Boston, MA, *for Amicus Curiae*, Harvard Immigration and Refugee Clinical Program, Women Refugees Project.

_____

CALABRESI, *Circuit Judge*:

In September 2001, petitioner Luluengisa Chantal Vumi ("Vumi"), a native and citizen of the Democratic Republic of Congo ("DRC"), applied for asylum and withholding of removal under the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1158, 1231, and for relief under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"), Dec. 10, 1984, S. Treaty Doc. No. 100-20, 1465 U.N.T.S. 85. She alleged that she had been twice arrested, interrogated, and mistreated by the DRC military, which suspected her ex-husband of involvement in the January 2001 assassination of then-DRC president Laurent Kabila. On December 10, 2004, an Immigration Judge ("IJ") granted Vumi's claim for CAT relief but denied her applications for asylum and withholding, finding that petitioner had failed to demonstrate that the harm she suffered was on account of a protected ground under the INA. The Board of Immigration Appeals ("BIA" or "the Board") affirmed this determination on the same basis. Petitioner subsequently sought our review of the BIA's decision.

Before us, petitioner challenges the agency's determination that she did not suffer persecution on account of her membership in a particular social group or due to political opinion

imputed to her. We conclude that the IJ and BIA erred in evaluating Vumi's claim, and we remand to give the Board the opportunity to determine properly, in the first instance, the scope of these protected grounds for asylum and withholding relief.

## I. BACKGROUND

Petitioner fled her native country for the United States and arrived in July 2001. In September 2001, Vumi filed an I-589 application for asylum, withholding of removal, and CAT relief. Following an interview with an asylum officer in January 2002, Vumi's case was referred to an IJ. After hearing her testify and reviewing her documentary submissions, the IJ accepted Vumi's testimony as true.

Vumi testified that she married Charles Kayitaba, a Rwandan citizen and ethnic Tutsi, in 1991. Though the couple separated in 1994, they both remained in Kinshasa in the DRC and stayed in contact because they had a child together. In 1997, Kayitaba began work as a chauffeur and bodyguard for then-president Laurent Kabila. Because he was on duty on the day Kabila was assassinated, January 16, 2001, Kayitaba was suspected of involvement in the assassination. He fled to Rwanda and called Vumi to inform her of his location. In February 2001, a group of military soldiers entered Vumi's house to search for Kayitaba, demanded that she reveal information about him and about the assassination, and looted the house. In mid-March 2001, the military soldiers returned to Vumi's home. When Vumi refused to reveal Kayitaba's location, they arrested her.

Vumi was detained for one week in a dark cell in which soldiers tied her hands behind her back, cut her hair, shined bright lights in her eyes, and hit her whenever she provided unsatisfactory answers to their repeated demands for information about Kayitaba's location.

Eventually, a human rights organization of which Vumi was a member, La Voix des Sans Voix, was able to secure her release. Vumi subsequently related the news of her detention to Kayitaba, who advised her to leave the DRC. She received assistance in obtaining a passport and U.S. visa from a friend in the Department of Social Services and scheduled a mid-July 2001 flight out of the DRC.

In June 2001, however, when she was returning from work, Vumi was again captured by soldiers who forced her into a military truck and brought her to a military camp called Kokolo. For two weeks, Vumi was kept in a dirty, mosquito-infested cell with no furniture or toilets, fed minimally, and beaten with whips. The soldiers subjected her to repeated, two-hour long interrogations to determine Kayitaba's "destination, and they also wanted [her] to tell them something about Mr. Laurent [Kabila's] assassination." Vumi refused to reveal that Kayitaba was in Rwanda because she feared that "they [would] keep on asking [her] some questions for which [she] didn't have an answer." Vumi also did not reveal that Kayitaba was a Rwandan citizen, instead stating that he was from the Kivu Province of the DRC.

After Vumi refused to perform sexual favors for a soldier in return for her release from prison, the soldier fondled her, struggled with her as she resisted, and urinated on her. His attempt to rape her was unsuccessful, but he returned another day, repeated his offer, and on her refusal, did, in fact, rape her. When she developed a fever and nosebleeds, Vumi was transferred from her cell to the military camp hospital where one of the nurses recognized Vumi from church and helped her to escape. Vumi then went into hiding with an aunt. Vumi's friend in the Department of Social Services again secured her a false passport and visa, and Vumi left the DRC at the end of July 2001. When Vumi spoke with her family by telephone, they informed her that the military continued to look for her at her house.

4

The IJ found that Vumi's brutal treatment by the military unquestionably amounted to persecution, but that she failed to demonstrate that the harm she suffered was on account of a protected ground. First, the IJ concluded that the harm was not inflicted due to membership in a particular social group because "relatives of assassination suspects" do not necessarily comprise a group of persons with similar backgrounds, habits, or social status; the families of assassination suspects do not have any relation to each other; and this group is not "sufficiently recognizable and discreet [sic] as viewed by society in general." Second, the IJ did not find that the harm was inflicted, in whole or in part, on account of imputed political opinion. Instead, the IJ held that

> [F]rankly . . . the government's interrogation of [Vumi] would be quite reasonable in light of the fact that her husband was a bodyguard of Kabila, was a Rwandan, and a Tutsi, and had fled the area. Clearly, the government had a very rational reason to interview or interrogate [her]. Also, the government may well have been annoyed at [Vumi] because she was not telling them the truth.

Finally, the IJ also concluded that any persecution that Vumi might face in the future would not be on account of a protected ground. As a result, on each of these bases, the IJ denied Vumi's application for asylum and withholding of removal.

Finding, however, a "significant likelihood" that Vumi would be arrested and tortured in light of her past mistreatment and the DRC's current human rights record, the IJ granted Vumi's application for CAT relief, because such relief does not require a nexus to a protected ground. In January 2005, the IJ denied Vumi's motion for reconsideration of her asylum and withholding claims.

The BIA adopted and affirmed the IJ's decision denying asylum and withholding relief. It stated that Vumi's "alleged social group, defined as 'family member[s] of a person who served as a Kabila bodyguard at the time of the assassination[,]' [did] not qualify as a particular social group." The Board noted that Vumi made no claim of family relationship with the relatives of

other assassination suspects, and that the "general characteristic of the purported group [was] insufficient to constitute a 'particular social group.'" In addition, noting the absence of evidence that Vumi was "ever questioned about her political activities or views, or [about] her affiliation with her former employer La Voix des Sans Voix," the BIA found "insufficient direct or circumstantial evidence" that her persecution "was motivated, at least in part, by an actual or imputed" political opinion.

We vacate the decision of the BIA and remand the case for further proceedings.

## II. DISCUSSION[1]

We review the decision of the IJ as supplemented by the BIA. *See Yu Yin Yang v. Gonzales*, 431 F.3d 84, 85 (2d Cir. 2005). Questions of law and the application of law to undisputed fact are examined *de novo*. *See Secaida-Rosales v. INS*, 331 F.3d 297, 307 (2d Cir. 2003). Where a question of interpretation of an ambiguous statutory term is involved, however, we give deference to the BIA's reasonable interpretation. *See INS v. Aguirre-Aguirre*, 526 U.S. 415, 424 (1999). We review the agency's factual findings under the substantial evidence standard. 8 U.S.C. § 1252(b)(4)(B); *see also INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992).

To be eligible for asylum relief, an applicant must show that she has suffered past persecution "on account of race, religion, nationality, membership in a particular social group, or political opinion," or that she has a well-founded fear of future persecution on account of one of these grounds. *See* 8 U.S.C. § 1101(a)(42). "An alien's fear may be well-founded even if there is only a slight, though discernible, chance of persecution." *Diallo v. INS*, 232 F.3d 279, 284 (2d

[1] This case was originally docketed on our Non-Argument Calendar ("NAC"). *See* Interim Local Rule § 0.29. The Government, to its credit, consented to a remand for many of the reasons discussed below. The NAC panel, however, believing that the case warranted decision by opinion rather than by summary order, referred the case to the Regular Argument Panel.

Cir. 2000) (citing *INS v. Cardoza-Fonseca*, 480 U.S. 421, 431 (1987)). An applicant who satisfies the higher burden of demonstrating a clear probability of future persecution on account of one of the five grounds is automatically entitled to withholding of removal under 8 U.S.C. § 1231(b)(3). *Diallo*, 232 F.3d at 284-85.

We have no reason to doubt that the IJ and BIA held that Vumi's treatment constituted persecution. Accordingly, the key issue on appeal is whether Vumi's persecution was on account of either of two grounds for asylum and withholding relief: her membership in a particular social group or her political opinion.

***Membership in a Particular Social Group***

**(1)**

The BIA's seminal decision in *Matter of Acosta* defines the standard for what constitutes a particular social group. 19 I. & N. Dec. 211, 233-34 (BIA 1985), *overruled in part on other grounds by Matter of Mogharrabi*, 19 I. & N. Dec. 439 (BIA 1987). Holding that Salvadoran taxi drivers are not cognizable as a particular social group because they can change professions, the BIA in *Matter of Acosta* set forth the following standard:

> [W]e interpret the phrase "persecution on account of membership in a particular social group" to mean persecution that is directed toward an individual who is a member of a group of persons all of whom share *a common, immutable characteristic. The shared characteristic might be an innate one such as . . . kinship ties*, or in some circumstances *it might be a shared past experience* such as former military leadership or land ownership. The particular kind of group characteristic that will qualify . . . remains to be determined on a case-by-case basis. However, *whatever the common characteristic that defines the group, it must be one that the members of the group either cannot change*, *or should not be required to change* because it is fundamental to their individual identities or consciences.

*Id*. (emphasis added). Our court endorsed this standard in *Hong Ying Gao v. Gonzales*, 440 F.3d 62, 67-70 (2d Cir. 2006). We conclude in the instant case that the IJ and BIA erred, both in their

incomplete characterization of Vumi's proposed "particular social group" and in their failure to evaluate this claim according to the *Acosta* standard as we have applied it in *Gao*.

**(a)**

We begin with the BIA's failure to evaluate fully Vumi's social group claim. She originally claimed before the agency that she was persecuted on account of her membership in two particular social groups. Both these groups derive from her marital relationship to Charles Kayitaba, but in fact they are quite distinct. The first group is "her husband's particular family." The second group consists of the "family members of the presidential bodyguards and security and military officers who had been serving at the time of the Kabila assassination." It is the first of these that she presses on appeal.

The IJ *expressly noted* petitioner's contention that her nuclear family forms one basis of her group claim because "her familiar [sic] relationship to her husband is something that she does not have the power in which to change." And in her brief to the BIA, the petitioner clearly stated: "The particular social group that Ms. Vumi is relying on [is] membership in the family of a person suspected of participating in the Laurent Kabila assassination . . . .".

Despite Vumi's uncontested assertion of this claim, and its seeming recognition by the IJ, neither the IJ nor the BIA considered whether Vumi's membership in Kayitaba's nuclear family implicated the "particular social group" ground of protection under the INA. The IJ addressed, and summarily rejected, only the second of Vumi's social-group claims, stating: "[I]t appears that there is not one specific family involved in this proposed group, but *a number of families that really do not have any relationship to each other except for the fact that their family members have been assassination suspects*." (emphasis added). On this basis the IJ concluded that Vumi's

8

proposed group is not "sufficiently recognizable and discreet [sic] as viewed by society in general [to be] . . . a particular social group."

The BIA also addressed only Vumi's relationship to the families of other assassination suspects in examining her particular social group membership. It too completely ignored her individual family relationship to Kayitaba. Remarkably, the Board concluded that Vumi's claimed status as the "family member of a person who served as a Kabila bodyguard at the time of the assassination" failed to allege any "indicat[ion] that she shares a familial or clan relationship with the other members of her defined group, thus *there is no claim of family membership*." (emphasis added). In light of the Board's own observation that, under its precedent, "family membership can constitute membership in a particular social group for purposes of asylum," this was clear error.

The BIA has long recognized that "kinship ties" may form a cognizable shared characteristic for a particular social group. *See, e.g., Acosta*, 19 I. & N. Dec. at 233. And more recently, the BIA has deemed the family or clan to be a "particular social group" when its members are recognizable by virtue of shared immutable characteristics "inextricably linked to family ties." *Matter of H-*, 21 I. & N. Dec. 337, 342 (BIA 1996). While the BIA has stated that it has not ruled "*categorically* that membership in any clan would suffice," *In re C-A-*, 23 I. & N. Dec. 951, 959 (BIA 2006) (emphasis added), the Board has held unambiguously that membership in a nuclear family *may* substantiate a social-group basis of persecution.

But if such membership *may* support a social group grounding of persecution, it must be considered by the agency. And it is beyond cavil that the agency failed to address this part of Vumi's claim. It follows that the BIA's misconstruction of Vumi's appeal was essential to its finding that the "general characteristic of the purported group . . . insufficient to constitute a

9

'particular social group.'" (citing *Gomez v. INS*, 947 F.2d 660, 664 (2d Cir. 1991)). And that, by itself, would require that we grant the petition and remand the case to the BIA.

**(b)**

The IJ and BIA decisions did consider Vumi's claim that she was persecuted on account of her membership in a second particular social group: that of family members of assassination suspects. Since Vumi has not pressed that claim on appeal, we do not here review it.

In the interests of judicial economy, however, we note that very recently – and since the BIA's decision in Vumi's case – our Court has examined the general issues involved in that claim. *Koudriachova v. Gonzales*, 490 F.3d 255, 261-63 (2d Cir. 2007). In *Koudriachova*, the Court discussed the proper interpretation of our decision in *Gomez*, 947 F.2d at 664, the relation between *Gomez* and the BIA's rulings in *Acosta*, 19 I. & N. Dec. at 233-34, and *In Re C-A-*, 23 I. & N. Dec. at 960, and the meaning of *Gomez* in light our decision in *Hong Ying Gao v. Gonzales*, 440 F.3d at 69. On remand, if Vumi opts to return to that claim, the BIA may wish to review its decision in view of *Koudriachova*.

\* \* \*

Because the agency failed to consider whether Vumi's *individual family* constitutes a particular social group under the INA, we must remand this case to the BIA so that it may evaluate the evidence properly and make the initial determination. *See INS v. Ventura*, 537 U.S. 12, 17 (2002) (per curiam) ("Generally speaking, a court of appeals should remand a case to an agency for decision of a matter that statutes place primarily in agency hands."); *see also Thomas v. Gonzales*, 126 S. Ct. 1613, 1615 (2006) ("The agency has not yet considered whether

[petitioner]'s family presents the kind of 'kinship ties' that constitute a 'particular social group.' The matter requires determining the facts and deciding whether the facts as found fall within a statutory term."); *see also Ucelo-Gomez*, 464 F.3d at 168.

It bears underscoring that the BIA must apply the correct standard on remand to Vumi's "nuclear family" claim, that is, it must do so in light of *Koudriachova*, 490 F.3d at 261-63.

### (2) *Imputed Political Opinion*

Vumi also asserts that she was persecuted on account of an anti-Kabila political opinion which the DRC soldiers imputed to her based on Kayitaba's suspected involvement in the assassination of Laurent Kablia. "[A]n imputed political opinion, whether correctly or incorrectly attributed, can constitute a ground of political persecution within the meaning of the Immigration and Nationality Act." *Chun Gao v. Gonzales*, 424 F.3d 122, 129 (2d Cir. 2005) (internal alterations and quotations omitted).

It is, moreover, well-established that Vumi "cannot be expected to provide direct proof of [a] persecutor['s] motives," *INS v. Elias-Zacarias*, 502 U.S. 478, 483 (1992), and that the protected ground under the INA need not be the sole motive: "The plain meaning of the phrase 'persecution on account of the victim's political opinion,' does not mean persecution *solely* on account of the victim's political opinion." *Osorio v. INS*, 18 F.3d 1017, 1028 (2d Cir. 1994). We find that in rejecting any nexus between Vumi's persecution and imputed political opinion, the BIA and the IJ "examined neither the political dimension" of the military's treatment of Vumi nor its political context in the DRC, as our cases require. *Id*. at 1029.

**(a)**

First, we consider the political context in which Vumi's persecution took place. The agency deemed plausibly reasonable the DRC's law-enforcement interest in investigating the assassination of the former President. But in reaching this conclusion, the BIA and IJ failed to examine the political context or country conditions in DRC. In *Matter of Izatula*, 20 I. & N. Dec. 149 (BIA 1990), the Board required consideration of whether "the existing political situation in [petitioner's country was] different from that of countries where citizens have an opportunity to seek change in the political structure of the government via peaceful processes." *Id.* at 154. As a result, the *Izatula* Board reversed an IJ's conclusion that political opinion was not a valid ground of asylum for an individual who was arrested and tortured by Afghan government officials based on suspicion that he provided supplies to mujahedin engaged in armed rebellion against the Afghan government.

In doing so, the BIA stated:

> [W]e find no basis in the record to conclude, as the immigration judge did, that any punishment which the Afghan Government might impose on the applicant on account of his support for the mujahedin would be an example of a legitimate and internationally recognized government taking action to defend itself from an armed rebellion. The Country Reports explain that in Afghanistan, "[c]itizens have neither the right nor the ability peacefully to change their government. Afghanistan is a totalitarian state under the control of the [People's Democratic Party of Afghanistan], which is kept in power by the Soviet Union." *We accordingly find the existing political situation in Afghanistan to be different from that of countries where citizens have an opportunity to seek change in the political structure of the government via peaceful processes.*

*Id.* at 153-54 (emphasis added) (citations omitted) (citing *Dwomoh v. Sava*, 696 F. Supp. 970, 979 (S.D.N.Y. 1988) ("[The] general rule [that] prosecution for an attempt to overthrow a lawfully constituted government does not constitute persecution . . . [is not] applicable in countries where a coup is the only means through which a change in the political regime can be

12

effected.")).

Moreover, the Board recently affirmed this framework for examining imputed political opinion claims, stating in *In re S-K-*, 23 I. & N. Dec. 936, 940-41 (BIA 2006), that in countries where a coup is the only means of effectuating political change, prosecution for attempting to overthrow the government is a form of political persecution.

No such evaluation can be discerned in the instant case. Moreover, the record before us could be read to support the proposition that the Congolese regime did not allow peaceful change and, accordingly, constituted a political context different from those wherein anti-government efforts might provide a valid basis for robust law-enforcement responses. Under the circumstances, the fact that neither the IJ nor the BIA addressed that proposition, and hence reached no conclusion on whether "there is [a] basis in the record to conclude that any punishment imposed by the [] Government would be a legitimate exercise of sovereign authority," *Matter of Izatula*, 20 I. & N. Dec. at 154, requires us to remand so that the agency may make that evaluation in the first instance. *See Thomas*, 126 S. Ct. at 1615.

**(b)**

Additionally, the IJ and BIA did not adequately take into account the potentially deeply political nature of Vumi's persecution. *See Osorio*, 18 F.3d at 1028. In *Matter of S-P-*, the BIA held that persecution based on political opinion is established when there is "direct or circumstantial evidence from which it is reasonable to believe that those who harmed the applicant were *in part motivated by an assumption that [her] political views were antithetical to those of the government.*" 21 I. & N. Dec. 486, 494 (BIA 1996) (emphasis added). The *S-P-* petitioner had been captured by the Sri Lankan military while working as a welder at a camp run

by the Tamil Tigers, and though the petitioner's interrogators had made no direct statements about his political views, they had demanded information about the identity and location of members of the Tamil Tigers. *Id.* at 487-88. The Board recognized that it is "not an easy task" to evaluate an applicant's claim that the government harmed him based on his imputed political views, rather than because of a "desire to obtain intelligence information" or prosecute legal violations. *Id.* at 494. Nevertheless, the BIA continued, "a combination of . . . motives" could suffice, because "prosecution for an offense may be *a pretext for punishing an individual for his political opinion . . . .*" *Id*. (emphasis added).

In *S-P*, the BIA approved a "totality of the circumstances" analysis for discerning persecutory motives, and identified the following nonexhaustive list of factors that may inform the analysis:

> 1. Indications in the particular case that the abuse was directed toward modifying or punishing opinion rather than conduct (e.g., statements or actions by the perpetrators or abuse out of proportion to nonpolitical ends);
> 2. Treatment of others in the population who might be confronted by government agents in similar circumstances;
> 3. Conformity to procedures for criminal prosecution or military law including developing international norms regarding the law of war;
> 4. The extent to which antiterrorism laws are defined and applied to suppress political opinion as well as illegal conduct (e.g., an act may broadly prohibit "disruptive" activities to permit application to peaceful as well as violent expressions of views);
> 5. The extent to which suspected political opponents are subjected to arbitrary arrest, detention, and abuse.

*Id.*

In the case before us, the IJ and BIA did not consider the potentially political nature of Kayitaba's suspected crime and the significance of the interrogation's scope that unquestionably far exceeded the bounds of legitimate questioning. Instead, the agency evaluated almost exclusively whether the Congolese military's detention, investigation, and torture of Vumi was

14

driven by her membership in La Voix des Sans Voix and, on this basis, found "insufficient direct or circumstantial evidence" that Vumi's harm was "motivated, at least in part, by an actual or imputed political context."

The BIA stated that Vumi was not "questioned about her political activities or views." But it entirely ignored testimony that, during Vumi's military interrogation and torture, the soldiers insistently pressed her to reveal her own knowledge of the assassination. Indeed, the IJ concluded that the government was "truly interested in getting information from [Vumi]" not only regarding "her husband's whereabouts" but also concerning "the assassination" itself. Yet the agency failed to address whether this and similar evidence proffered by Vumi was sufficient to show that the soldiers deemed her refusal to provide information as reflecting her own anti-Kabila political opinion.

Moreover, the agency did not apply the reasonableness standard for mixed-motive analysis prescribed in *Matter of S-P-*. It failed to gauge whether the DRC's interrogation and punishment for what Vumi claimed was a "politically related act," namely covering up for her husband, was "disproportionate to the crime," which would indicate persecution on grounds of political opinion rather than prosecution or legitimate law-enforcement interrogation. 21 I. & N. Dec. at 493. The undisputed record of Vumi's multiple arrests, extended detention, and torture should have been considered by the IJ and BIA in evaluating the extent to which the DRC interrogations were informed by military officials' suspicion of Vumi's anti-Kabila opinion or actions.

In *Matter of B-*, the BIA examined in this way the possible mixed motives of the Afghan secret police in detaining and abusing the asylum applicant. The police imprisoned the petitioner as part of a search for his brother, whom the police believed to be a member of the mujahidin:

> The record indicates that the applicant was arrested . . . not only to obtain information from him about his brother, who was a mujahidin member, but also because the discovery of mujahidin fliers in his house led authorities to suspect that the applicant and his father were involved with the mujahidin too. . . . The applicant's detention and imprisonment for his support of the mujahidin constituted persecution on account of political opinion.

*Matter of B-*, 21 I. & N. 66, 71 (BIA 1995); *see also Matter of S-P-*, 21 I. & N. Dec. at 498

("Notably, the Board in *Matter of B-* did not become entangled in the impossible task of determining whether harm was inflicted because of the applicant's acts or because of his beliefs underlying those acts.").

In the case before us, the IJ conducted no such mixed-motive analysis based on the content of the interrogation or the severity of the methods used by the Congolese military. The IJ acknowledged that "while certainly, in this case, the harm inflicted on the respondent went well beyond the bounds of legitimate questioning, the questioning itself appears to have been legitimate." It is clear that the IJ's reasoning fails to comport with the standard for evaluating imputed political opinion claims as outlined in the BIA's own opinion in *Matter of S-P-*.

Finally, the IJ mentioned background materials indicating the Congolese government practice in which "members, or family members, or wives of assassination suspects have been or were arrested by the government," and noted that "[a] number of female defendants appear to be on trial purely because they are related to suspects in the assassination." The State Department country report from 2001, the year in which Vumi applied for relief, details at length the Congolese government's human rights record, and, in particular, its treatment of detainees who were perceived to be political opponents. *Matter of S-P-* relied on just these types of country report findings in evaluating imputed political opinion. But the agency wholly failed to apply this framework in the instant case.

\* \* \*

For all these reasons, we must remand Vumi's claim of imputed political opinion to the BIA so that it can properly examine that allegation in light of the agency's own established standards for mixed motive claims.

### III. CONCLUSION

We vacate and remand to the BIA for further evaluation of the case consistent with the proper standards for both social group and imputed political opinion persecution claims.