Tatiana PORADISOVA,
Pavel Poradisov,

and

**Gennadi Poradisov Petitioners,**

v.

**Alberto GONZALES,[1] Respondent.**

**Docket Nos. 02–4641, 02–4642, 03–40550, 03–40555.**

United States Court of Appeals, Second Circuit.

Argued: June 3, 2005.

Decided: Aug. 16, 2005.

---

1. United States Attorney General Alberto Gonzales is substituted as Respondent. *See* Fed. R.App. P. 43(c)(2).

Alexander Berkovich, New York, New York, for Petitioners Tatiana Poradisova, Pavel Poradisov, and Gennadi Poradisov.

Edward Olsen, Assistant United States Attorney for the Northern District of California, San Francisco, California for Respondent Alberto Gonzales.

Before: McLAUGHLIN, STRAUB, and HALL, Circuit Judges.

STRAUB, Circuit Judge.

Petitioners Tatiana Poradisova and Gennadi Poradisov and their son Pavel Poradisov ("Poradisovs") petition for review of Board of Immigration Appeals ("BIA") de-

cisions summarily affirming the denial of their asylum application and denying their motion to reopen. The Poradisovs argue that the Immigration Judge ("IJ") and BIA erred in 1) finding that the Poradisovs failed to meet their burden of proof despite their extensive and detailed testimony, 2) finding that the abuse they recounted did not amount to persecution, and 3) failing to take note of the record evidence of general antisemitism in Belarus. With respect to their motion to reopen, the Poradisovs argue that the BIA's denial was an abuse of discretion because they had met their burden of showing materially worsened conditions in Belarus since their original application.

We agree with the Poradisovs that the IJ's legal analysis was flawed in a number of significant respects, and that the BIA's affirmance of her decision must therefore be vacated. Specifically, the IJ erred in dismissing certain portions of the Poradisovs' testimony for lack of corroboration (much of which, in all likelihood, was not reasonably available), in failing to consider the cumulative significance of the events described, in drawing adverse inferences from the Poradisovs' decision not to seek protection from the police or seek asylum from the United States Consulate in Belarus, in dismissing Tatiana's account of anonymous threats solely because the threats were anonymous, and in dismissing as irrelevant evidence that similarly-situated friends of the Poradisovs had been persecuted. As an additional ground for remand, we hold that the BIA abused its discretion in denying the Poradisovs' motion to reopen because it inexplicably dismissed as "merely cumulative" the strong evidence they presented that antisemitism in Belarus is virulent and on the rise. For both these reasons, either of which would suffice for remand, we grant the petitions for review, vacate the BIA decision affirming the IJ's denial of asylum, reverse the BIA decision denying the motion to reopen, and remand for further proceedings in conformity with this opinion.

## BACKGROUND

The Poradisovs–Tatiana and Gennadi and their son Pavel-are part-Jewish Belarusians from the city of Minsk who arrived in the United States in 1991 and 1992 and immediately applied for asylum based on ethnic/religious persecution. For unknown reasons, their first hearing before an IJ did not take place until October 1997. In the series of hearings that followed, Tatiana and Gennadi testified that throughout their lives they were mistreated because of their Jewish ethnicity.

The Poradisovs' testimony, somewhat distilled, is as follows. Tatiana's father, who was not Jewish, was harassed by neighbors in their high-rise apartment about having married a Jewish woman-told, for example, that his wife had an offensive odor-to the point where he eventually moved out of the apartment, although he stayed in contact with the family and assisted them financially. At the end of eighth grade, because they were Jewish, Tatiana and a friend were forced by their school to transfer to another, more distant school. When Gennadi was in eighth grade, his class was talking about WWII, and a negative comment was made about Jews (questioning their loyalty to Russia). Gennadi protested because his grandfather had been killed in the Holocaust. He was taken into the basement of the school and badly beaten by several of his classmates. He suffered a head injury and a broken nose and finger, and had to be hospitalized.

This abuse allegedly continued into Tatiana's and Gennadi's adulthood. In 1988, Tatiana and Gennadi participated in a peaceful demonstration in memory of Jews

who died in WWII. (Gennadi participated every year.) The demonstration was violently attacked by an antisemitic group, although neither of the Poradisovs was physically harmed. The police came and, rather than arresting the attackers, arrested the Jewish demonstrators for "organizing a fight in a public place." A good friend of the Poradisovs' was arrested and "beat up very badly" in prison. He was marked as an "activist Zionist" on his work papers, and thereafter was unable to find work. He left for the United States, where he currently resides.

In another alleged incident, the son of good friends of the Poradisovs, also Jewish, committed suicide after being verbally and physically abused by his classmates. In a suicide note, the boy stated that he could no longer live as an "ever persecuted kike." According to the Poradisovs, their friends had tried to convince the school to intervene, without success. Tatiana testified that she feared that her young son, Pavel, would face similar abuse when he started attending school. The Poradisovs also described, as a general aspect of life, that antisemitic groups would distribute fliers, send letters, and make phone calls threatening Jews and inciting others to attack them. As a result of this atmosphere, the Poradisovs refrained from going out at night because they believed that they would be physically attacked by ultranationalists.

Sometime after Pavel was born, the Poradisovs purchased a local business selling ice cream. Tatiana testified that they were continually harassed by the authorities and forced to renovate and pay fines, even though their premises were far cleaner than other stores. On September 3, 1991, their ice cream store was burned down. The Poradisovs did not witness the event, but a neighbor who lived across the street told them that the men who attacked the store were shouting "dirty Jews" and similar epithets. The neighbor called the police, but when they came, they gave her the impression that nothing would be done about the incident and that it would be better not to pursue the case.

Also in 1991, Gennadi left Belarus for the United States. Tatiana testified that, after he left, the local authorities began visiting her and asking her questions about her husband. She also received threatening phone calls, beginning in Spring, 1992, accusing her husband of being a traitor and telling her to leave or she or her son would be killed. Their home was also broken into and vandalized at this time.

The 1997 and 1998 State Department country reports in the record described growing societal antisemitism met by governmental inaction, antisemitic media, official antisemitic statements made as propaganda against the opposition party, desecration of Jewish cemeteries, and some targeting of prominent Jewish individuals for harassment or prosecution.

The IJ denied the Poradisovs' claims in a decision issued September 20, 1999, finding that they had "failed to demonstrate sufficient evidence to be entitled to" asylum. Although the IJ did not make an adverse credibility determination, she found parts of the Poradisovs' account "nebulous," noted the lack of documentary evidence that Tatiana was part-Jewish, and found that certain facts "undermined" their claim-namely, that the Poradisovs never filed police complaints, that the threatening callers never identified themselves, that the Poradisovs did not inform the American Consulate of their alleged reason for leaving Belarus, that Gennadi was able to graduate from high school and later to find employment by a state company, and that the Poradisovs had failed to submit any supporting affidavits from family or friends. As for the specific incidents

described, the IJ found that each, considered individually, fell short of amounting to persecution because they were either remote in time, insufficient in degree, or (in the case of attacks on the Poradisovs' friends) not sufficiently connected to their own situation. The BIA summarily affirmed the IJ's decision in an order dated October 10, 2002, and the Poradisovs filed petitions for review by this Court.

In January, 2003, the Poradisovs also moved to reopen their case based on worsened antisemitism in Belarus. In support of this motion, they submitted the 2001 State Department report on Belarus which characterized the overall human rights situation as "[still] very poor and worse[ ] in several areas." Pertinent to the Poradisovs' claims, the report observed that "[r]egime officials took a number of hostile actions toward the Jewish community" as well as toward other minority faiths, and connected this hostility to a dominant "Slavic Unity"/pro–Russia philosophy. Specifically, the Report stated that the government does nothing to counter the spread of antisemitic literature and antisemitic vandalism; harasses proselytizing messianic Jews; arrested Jews picketing the illegal destruction of a synagogue in Minsk (the Poradisovs' home city), and prosecuted one of the picketers; makes openly antisemitic statements; refuses to create memorials to Belarusian Holocaust victims or help maintain Jewish cemeteries or monuments; and refused to investigate the recent firebombing of a synagogue in Minsk. The report further found that "[s]ocietal anti-Semitism persisted and sentiment critical of minority faiths increased," with "a number of small, ultrana-

tionalist organizations operat[ing] on the fringes of society, and a number of newspapers regularly print[ing] antisemitic material" as well as antisemitic material from Russia "circulat[ing] widely." The Poradisovs presented other official statements as to the "accelerating deterioration of respect for human rights in Belarus" and the Belarusian government's "outlaw" status in Europe.

The Poradisovs also submitted several reports by the advocacy groups National Conference for Soviet Jewry and Union of Councils for Soviet Jews. These reports warn that openly antisemitic individuals have been appointed to head the government agency that controls the media and have themselves appointed antisemitic and neo-Nazi editors to particular magazines. They also report that neo-Nazis attacked a Jewish Sunday school, and officials tried to close that same school for promoting "Zionist propaganda"; that there have been arson and other attacks on Jewish organizations; that antisemitic graffiti (such as swastikas, a Star of David hanging from a gallows, and exhortations to kill Jews) is widespread; that Jewish cemeteries have been desecrated; and that the government is unwilling to protect Jews.

The BIA summarily denied the motion on August 28, 2003, stating without elaboration that the documents submitted "are merely cumulative to the original asylum claim and do not show materially changed circumstances in Belarus." The Poradisovs petition this Court for review of the BIA's 2003 decision, and their petitions have been consolidated with their earlier petitions.[2]

---

**2.** Because the Poradisovs applied for asylum prior to April 1, 1997, and the final order in their case was issued after October 30, 1996, we have jurisdiction to consider their petitions pursuant to the transitional rules of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub.L. No. 104–208, § 309(c)(1), 110 Stat. 3009, 3009–546, 3009–625, which preserved jurisdiction under 8 U.S.C. § 1105a(a) (repealed 1996) in cases such as these. *See Secaida–Rosales v. INS*, 331 F.3d 297, 305 n. 1 (2d Cir.2003).

## DISCUSSION

### I. Standard of Review

 The scope of our review of an IJ's factual findings is narrow, and we uphold such findings so long as they are supported by "substantial evidence." *Jin Shui Qiu v. Ashcroft*, 329 F.3d 140, 148 (2d Cir.2003) (internal quotation marks omitted). The "substantial evidence" standard, however, is slightly stricter than the clear-error standard generally applied to a district court's factual findings. *Id.* at 149. We require "more than a mere scintilla" of evidence, or "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Alvarado–Carillo v. INS*, 251 F.3d 44, 49 (2d Cir.2001) (internal quotation marks omitted).

 By contrast, we review *de novo* the IJ's determination of mixed questions of law and fact, as well as the the IJ's application of law to facts. *Secaida–Rosales v. INS*, 331 F.3d 297, 307 (2d Cir. 2003); *Jin Shui Qiu*, 329 F.3d at 149; *Alvarado–Carillo*, 251 F.3d at 49; *Diallo v. INS*, 232 F.3d 279, 287 (2d Cir.2000). Importantly, the IJ's application of an "inappropriately stringent standard when evaluating an applicant's testimony" is considered an error of law. *Secaida–Rosales*, 331 F.3d at 307 (2d Cir.2003); *see also Islami v. Gonzales*, 412 F.3d 391, 396 (2d Cir.2005).

 Despite our generally deferential review of IJ and BIA opinions, we require a certain minimum level of analysis from the IJ and BIA opinions denying asylum, and indeed must require such if judicial review is to be meaningful. *See, e.g., Diallo*, 232 F.3d at 287–89 (vacating a decision because the BIA failed to make a credibility finding, explain why its demand for corroborative evidence was reasonable, or assess Diallo's stated reasons for failing to provide certain corroboration); *Anderson v. McElroy*, 953 F.2d 803, 806 (2d Cir. 1992) ("[W]e cannot assume that the BIA considered factors that it failed to mention in its decision." (internal quotation marks omitted)); *Sanon v. INS*, 52 F.3d 648, 651 (7th Cir.1995) (explaining that courts of appeals defer to BIA rulings only where there is "proof that the Board has *exercised* its expertise in hearing a case" (emphasis added)). We also require some indication that the IJ considered material evidence supporting a petitioner's claim. *Yan Chen v. Gonzales*, 417 F.3d 268 (2d Cir.2005) (IJ erred in failing to consider favorable country condition reports). Inadequate analysis or failure to consider important evidence, moreover, "are not excused by the fact that a hypothetical adjudicator, applying the law correctly, might also have denied the petition for asylum." *Jin Shui Qiu*, 329 F.3d at 149.

 We review denials of motions to reopen for abuse of discretion. *Iavorski v. INS*, 232 F.3d 124, 128 (2d Cir.2000). Although the BIA has broad discretion in deciding such motions, it abuses this discretion if it acts in an "arbitrary or capricious manner," or if its decision "provides no rational explanation, inexplicably departs from established policies, is devoid of any reasoning, or contains only summary or conclusory statements." *Ke Zhen Zhao v. U.S. Dep't of Justice*, 265 F.3d 83, 93 (2d Cir.2001) (internal citations omitted); *see also Mohammed v. Gonzales*, 400 F.3d 785, 792 (9th Cir.2005) ("[T]he BIA must issue a decision that fully explains the reasons for denying a motion to reopen.").

### II. The governing law

#### A. Asylum applications

 To establish eligibility for asylum, a petitioner must show that he has suffered past persecution on account of "race, religion, nationality, membership in a par-

ticular social group, or political opinion," or that he has a well-founded fear of future persecution on these grounds. *See* 8 U.S.C. § 1101(a)(42); *Diallo,* 232 F.3d at 284. A showing of past persecution, although rarely sufficient in itself to entitle an applicant to asylum, automatically gives rise to a rebuttable presumption of a well-founded fear of future persecution, which the government can only overcome if "a preponderance of the evidence establishes that a change in circumstances in the applicant's country of nationality has occurred such that the applicant's fear is no longer well-founded." *Guan Shan Liao v. U.S. Dep't of Justice,* 293 F.3d 61, 67 (2d Cir.2002) (citing 8 C.F.R. § 208.13(b)(1)(i)). "An alien's fear may be well-founded even if there is only a slight, though discernible, chance of persecution." *Diallo,* 232 F.3d at 284 (citing *INS v. Cardoza–Fonseca,* 480 U.S. 421, 431, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987)).

### B. Motions to reopen

■ An asylum applicant may, at any time, move to reopen his case "based on changed circumstances arising in the country of nationality or in the country to which deportation has been ordered, if such evidence is material and was not available and could not have been discovered or presented at the previous hearing." 8 C.F.R. § 1003.2(c)(3)(ii) (2003). To prevail on the motion, the movant must also establish *prima facie* eligibility for asylum, *i.e.,* "a realistic chance" that he will be able to establish eligibility. *Guo v. Ashcroft,* 386 F.3d 556, 563–64 (3d Cir.2004) (reversing denial of motion to reopen as having been based on an overly strict standard); *see also Reyes v. INS,* 673 F.2d 1087, 1089 (9th Cir.1982).

■ When an applicant moves to reopen his case based on worsened country conditions, and introduces previously un-

available reports that *materially* support his original application, the BIA has a duty to consider these reports and issue a reasoned decision based thereon, whether or not these reports are clearly determinative. *See Yu Zhao v. Gonzales,* 404 F.3d 295, 304 (5th Cir.2005) (BIA abused its discretion, and indeed "erred egregiously," in denying motion to reopen based on Country Reports showing worsened situation in China for Zhao's religious group); *Mansour v. INS,* 230 F.3d 902, 907 (7th Cir.2000) (reversing BIA denial of motion to reopen in part because of BIA's "silence with regard to the U.S. Department of State's Report (1998) that suggests that the Iraqi government has engaged in abuses against [Mansour's religious/ethnic group]"); *cf. Blanco v. INS,* 68 F.3d 642, 646 (2d Cir.1995) (finding BIA abused its discretion in denying a motion to reopen based on "extreme hardship," where BIA failed to note the "most salient" evidence presented by Blanco); *Yan Chen,* 417 F.3d 268 (vacating and remanding denial of asylum for failure to consider country conditions report); *Mostafa v. Ashcroft,* 395 F.3d 622, 625 (6th Cir.2005) (vacating and remanding denial of Convention Against Torture relief where BIA's opinion "fail[ed] to give adequate consideration to the country conditions in Iran").

### III. The decisions below, analyzed

#### A. Denial of asylum

■ As the BIA summarily affirmed the IJ's opinion, we review that opinion directly. *Zhang v. U.S. Dep't of Justice,* 362 F.3d 155, 159 (2d Cir.2004). After summarizing the evidence presented, the IJ stated her conclusion that the Poradisovs "failed to demonstrate sufficient evidence to be entitled to the relief that they seek." The IJ then addressed each aspect of their account "seriatim," dismissing it as either undocumented, uncorroborated, un-

connected to the Poradisovs personally, "nebulous," remote in time, or insufficient in degree to amount to persecution. With respect to a number of the incidents, the IJ found that their evidentiary value was negated by the fact that they were not "formally reported" to the police. The threats Tatiana received were, according to the IJ, "of no value" because they were anonymous. Finally, the IJ found the Poradisovs' claim undermined by Gennadi's ability to find employment with a state company and by the Poradisovs' decision to seek a guest visa from the United States Consulate rather than seeking asylum there.

 The IJ erred in the legal standards she applied in reviewing the Poradisovs' evidence, and in disregarding relevant evidence. To begin with, although the IJ identified no inconsistencies in the Poradisovs' testimony and made no adverse credibility finding, she apparently dismissed significant portions of the Poradisovs' testimony as uncorroborated, without discussing whether such corroboration would have been obviously material and reasonably available. *See generally Diallo*, 232 F.3d at 287–89.[3] In fact, it seems likely that certain documents-*e.g.*, corroboration of Gennadi's beating *in 1969*, old medical records for the deceased son of

friends, an affidavit from a former neighbor in Belarus who saw the arson attack-were not reasonably available. *Cf. Ke Zhen Zhao*, 265 F.3d at 96 (reversing and remanding denial of a motion to reopen, after finding that BIA abused its discretion by speculating as to previous availability of certain evidence).[4] Moreover, in determining whether the Poradisovs' claims were corroborated, the IJ should have taken into account, as apparently she did not, that the State Department reports in the record confirmed the Poradisovs' account of the general societal and political antisemitism in Belarus. *Diab v. Ashcroft*, 397 F.3d 35, 40 (1st Cir.2005) ("Should the applicant be found not entirely credible, corroborating evidence, *such as country condition reports*, may be used to bolster an applicant's credibility." (emphasis added)); *cf. Yan Chen*, 417 F.3d 268.

██ Also troubling is the IJ's apparent (and erroneous) technique of addressing the severity of each event in isolation, without considering its cumulative significance. *See Korablina v. INS*, 158 F.3d 1038, 1044 (9th Cir.1998) ("A single isolated incident may not rise to the level of persecution, [but] the cumulative effect of several incidents may constitute persecution." (internal quotation marks omitted) (alteration in original)); *In re O–Z & I–Z–*,

---

3. We assume, arguendo, that the IJ was entitled to request such corroboration even though the Poradisovs' testimony was consistent and detailed. *See Jin Shui Qiu v. Ashcroft*, 329 F.3d 140, 154 n. 11 (2d Cir.2003) (assuming same, arguendo, but noting uncertainty in this Circuit on that question).

Assuming as much, there is the further unsettled issue of whether, without making an adverse credibility finding *and without prior warning to the applicant*, an IJ may base her denial solely on the absence of certain corroboration. Although we need not reach this issue here in light of the IJ's other errors (which also appear to have motivated her decision), we point out the fundamental un-

fairness of penalizing applicants to such an extent for the lack of certain documents without first providing them with notice and the opportunity to remedy that lack. On remand, we urge the IJ to give the Poradisovs an opportunity to submit any necessary corroboration (such as an affidavit from their friend and fellow exile, Michael Makavir) or explain why it is unavailable.

4. At the very least, the IJ should have inquired into the extent of the Poradisovs' continued contacts in Belarus. From their testimony, it appears they are only in touch with Tatiana's brothers and mother and Gennadi's mother.

22 I. & N. Dec. 23, 25–26 (BIA 1998) (holding that beatings, vandalism, threats, and humiliation, "[i]n the aggregate, ... rise to the level of persecution as contemplated by the Act"). We note that the need to view events cumulatively is also stressed in the Office of the United Nations High Commissioner for Refugees, *Handbook on Procedures and Criteria for Determining Refugee Status Under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees* (Geneva 1992), whose persuasive authority has been recognized by the Supreme Court.[5] The Handbook cautions that:

> Taking isolated incidents out of context may be misleading. The cumulative effect of the applicant's experience must be taken into account. Where no single incident stands out above the others, sometimes a small incident may be "the last straw"; and although no single incident may be sufficient, all the incidents related by the applicant taken together, could make his fear "well-founded."

*Id.* ¶ 201 (internal citation omitted); *see also id.* ¶ 53.

 The IJ erred in other respects as well. She appeared to give significant adverse weight to the fact that the Poradisovs did not file police reports after various incidents, despite evidence presented that the police themselves are antisemitic.[6] *Contra Korablina*, 158 F.3d at 1045 (noting as persuasive Korablina's testimony that "reporting this type of violence against Jews to the Kiev authorities is not helpful and is, in fact, often dangerous. . . .

[because] the police, known as the militia, are a part of the same ultra-nationalist and anti-Semitic group"). In assessing the severity of the antisemitism the Poradisovs faced, the IJ failed entirely to mention Gennadi's account of steady threats, both written and telephonic, by ultra-nationalist groups toward the Jews in his community, as well as his representation that these threats kept them from ever venturing out at night. The IJ also unreasonably dismissed as "of no value" the anonymous threatening calls Tatiana received in 1992 simply, and inexplicably, because they were anonymous. *Contra Secaida–Rosales v. INS*, 331 F.3d 297, 311 (2d Cir. 2003) ("[P]ersecutors are hardly given adequate notice that our government expects them to sign their names and reveal their individual identities when they deliver threatening messages." (internal quotation marks omitted)).

 The IJ further erred by dismissing the persecution suffered by friends as unrelated to the Poradisovs' claim when it was relevant evidence of what might happen to them. *See Lolong v. Gonzales*, 400 F.3d 1215, 1222–23 (9th Cir.2005) (experience of "similarly situated" friends and family is relevant to the issue of whether an applicant's fear is "well-founded"); *Abdel–Masieh v. INS*, 73 F.3d 579, 585 (5th Cir.1996) (BIA erred in failing to "expressly address" the experiences of Abdel–Masieh's family members and co-workers). Finally, the IJ seemed to attach great negative significance to the fact the Poradisovs sought guest visas

---

5. In *INS v. Cardoza–Fonseca*, 480 U.S. 421, 439 n. 22, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987), the Court found that, although not legally binding, the Handbook "provides significant guidance in construing the Protocol, to which Congress sought to conform."

6. The IJ appears, moreover, to have overlooked Tatiana's testimony that the neighbor

who witnessed the arson attack against their business *did* call the police, who came but indicated to her that it would be better for her not to pursue her complaint. This response, if credited, certainly explains why the Poradisovs would not have contacted the police at other times.

from the United States consulate without applying directly for asylum; however, they applied as soon as they arrived in the United States, and plausibly testified that they did not seek asylum in Belarus because they feared delay and/or legal obstacles to their escape.

Far from being harmless, these errors in evaluating the Poradisovs' evidence were fundamental to the IJ's stated reasons for denying the Poradisovs' claim. Accordingly, we vacate the BIA's October 10, 2002, order affirming her decision and remand to the BIA with instructions to remand to the IJ. On remand, the IJ should reconsider the Poradisovs' application in light of the foregoing.[7]

### B. Denial of motion to reopen

 We also agree with the Poradisovs that the BIA abused its discretion in denying their motion to reopen the case in August 2003. We recently explained in *Yan Chen v. Gonzales*, 417 F.3d 268 (2d Cir. 2005), that IJs and the BIA have a duty to explicitly consider any country conditions evidence submitted by an applicant that materially bears on his claim. A similar, if not greater, duty arises in the context of motions to reopen based on changed country conditions. *Supra* Section II.B.

The Poradisovs moved to reopen their case in September, 2003, and appended to their motion numerous recent reports on Belarus, both from official sources and from the Jewish advocacy groups National Conference for Soviet Jewry and Union of Councils for Soviet Jews.[8] As set forth more fully in the Background section of this opinion, these reports characterize the human rights situation in Belarus as "very poor" and in an "accelerating deterioration," and the Belarusian regime as "the lone outlaw in Europe." They describe an official and societal hostility towards Jews and other religious minorities-openly expressed-which in turn is related to a waxing "Slavic Unity"/pro–Russia philosophy. The reports detail how this hostility, in combination with a general climate of lawlessness, has manifested itself in widespread discrimination and violence against Jews both by the government and by private individuals who act with impunity. Most importantly, the reports show that the situation has worsened since the Poradisovs' original application,[9] and therefore significantly strengthens their asylum claim.

Under the legal principals set forth in II.B *supra*, the material submitted by the

7. As set forth below, the IJ should also consider the more recent country reports submitted with the Poradisovs' motion to reopen, which significantly bolster their (already strong) claim.

8. The regulations cite reports by "international organizations" as appropriate material for an IJ to consult in deciding an asylum application. 8 C.F.R. § 1208.12(a) (2005). Of course, not all organizational reports will merit equal weight, and IJs and the BIA have discretion to weigh them differently. We note, however, that reports by both of these groups have been listed by the United States Department of State as "specialized documents on religious practices and abuses of

religious freedom distributed by the INS Resource Information Center (RIC) to the Asylum Division since 1992." Dep't of State, 2001 Report on International Religious Freedom, Appx. D (Oct. 26, 2001), *available at* http://www.state.gov/g/drl/rls/irf/2001/5561.htm, (visited Aug. 3, 2005).

9. The 2001 State Department Report, in particular, devotes far more space to reports of antisemitic abuses and recounts far more specific incidents than did the 1997 and 1998 Reports introduced with the Poradisovs' original application. The clear inference is that conditions have been deteriorating, an inference confirmed by the official statement that there is "an accelerating deterioration of respect for human rights in Belarus."

Poradisovs in 2003 was sufficient to meet the Poradisovs' burden on their motion. It certainly warranted more than a perfunctory (and clearly inaccurate) mention by the BIA as being "merely cumulative." *See Yu Zhao v. Gonzales,* 404 F.3d 295, 304 (5th Cir.2005) (in denying Zhao's motion to reopen, BIA abused its discretion by disposing, in a single sentence, of new country conditions evidence as " 'largely repeat[ing]' " the evidence from the original record); *cf. Cordero–Trejo v. INS,* 40 F.3d 482, 492 (1st Cir.1994) (vacating and remanding denial of asylum because country conditions evidence was "far too extensive and significant to be dismissed with a general statement").

In light of the above, and because we also find that the Poradisovs' met their burden on the motion of showing a "realistic chance" that they will be able to establish eligibility for asylum, we reverse.

## CONCLUSION

For the foregoing reasons, we grant the petitions for review, vacate the BIA's October 10, 2002, order, reverse the BIA's August 23, 2003, order, and remand for further proceedings consistent with this opinion. We feel compelled to remind the IJ and BIA, as they proceed with this case on remand, that the asylum application process requires a good-faith *inquiry* into whether an applicant is entitled to this country's protection, and should never resemble "a search for a justification to deport." *Senathirajah v. INS,* 157 F.3d 210, 221 (3d Cir.1998) (emphasis omitted).