

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-3-2007

# Tchernycheva v. Atty Gen USA

Precedential or Non-Precedential: Non-Precedential

Docket No. 05-5152

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"Tchernycheva v. Atty Gen USA" (2007). *2007 Decisions.* Paper 627.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/627

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 05-5152

———————

NATALIA TCHERNYCHEVA;
MIKHAIL KOULIKOV
Petitioners

v.

ATTORNEY GENERAL OF THE UNITED STATES,
Respondent

———————

PETITION FOR REVIEW OF A DECISION OF
THE BOARD OF IMMIGRATION APPEALS
Agency Nos. A97-478-888 and A97-478-889
Immigration Judge: Hon. Annie S. Garcy

———————

Submitted Under Third Circuit LAR 34.1(a)
June 26, 2007

———————

Before: Before: BARRY, FUENTES, and JORDAN, Circuit Judges

(Opinion Filed: August 3, 2007)

———————

OPINION

———————

BARRY, Circuit Judge

Natalia Tchernycheva and Mikhail Koulikov petition for review of the order of the

Board of Immigration Appeals ("BIA") adopting and affirming the decision of the

Immigration Judge ("IJ") denying them relief. For the reasons that follow, we will deny the petition.

## I.

Tchernycheva and Koulikov (jointly, "petitioners") are citizens of Russia and entered the United States as nonimmigrant exchange students on J-1 visas, Tchernycheva entering on June 2, 2002, and Koulikov on June 11, 2002. The two are married; indeed, they claim to have been married twice.[1] On August 7, 2003, petitioners were placed in removal proceedings and charged with remaining in the United States longer than permitted. They admitted the allegations in the Notices of Removal and conceded removability, but applied for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT"),[2] claiming persecution on the basis of their Baptist faith by the Russian National Unity ("RNU"), a group the Russian government was allegedly unable or unwilling to control. The IJ denied their applications on June 10, 2004, but granted voluntary departure. On October 28, 2005, the BIA adopted and affirmed the IJ's decision and dismissed the appeal.

---

[1] Tchernycheva testified that she and Koulikov were married in Russia on July 30, 2000 but never obtained a marriage certificate. On March 31, 2003, they were married in Snow Hill, Maryland, apparently at City Hall.

[2] Koulikov submitted a separate I-589 application, an application that lacked any narrative whatsoever. To the extent he sought asylum, however, his claim was dependent on and derivative of his wife's claim. Were the circumstances of this case different, it might well be necessary to determine whether the incidents of alleged persecution which preceded the first marriage could be invoked in support of his derivative claim.

Petitioners claim to be Baptists who attended an unregistered Baptist church in Russia. Tchernycheva – and, to a lesser extent, Koulikov – testified to a number of incidents which, she argues, prove that she was persecuted based on her faith. We will discuss most of those incidents and, as we do so, we will weave in at least some of the reasons that caused the IJ to deny the applications.

Tchernycheva claimed, first, that she was denied admission to a university in 1996 because of her faith, a claim the IJ rejected at the hearing and later in her Opinion. There was "no evidence" presented of Tchernycheva's grades from secondary school or the admissions process and, in any event, she was subsequently admitted to the university – deferred entry into a university, said the IJ, is not persecution. The next incident allegedly occurred in April 1997 when, Tchernycheva testified, she was fired from her job at a bookstore for distributing religious literature and "proselytizing her religion" to customers. This, too, in the IJ's view, was not persecution, and the IJ instructed Tchernycheva to focus on the asylum claim, and not on every problem she had experienced. The IJ explained to Tchernycheva that it would not support an asylum claim to suggest that she did not get into a university when there was no evidence that she had even graduated from secondary school or was otherwise qualified, and that there is no right, even in the United States, to proselytize one's religion when one is supposed to be doing one's job.

Then, in November 1997, members of the RNU allegedly assaulted Tchernycheva and a "religious sister" at a bus stop, tore up their religious literature, and, after dragging the women into the bushes, threatened them with physical harm if they ever saw the women in the area again. Tchernycheva claimed to have suffered scratches and bruises from the encounter and said that she sought treatment at a hospital and called the police. In her asylum application, however, she did not mention that she had called the police or that she had been dragged into the bushes. The IJ found the latter was a material difference from the asylum application but, for reasons not critical here, declined to determine, as to this incident, whether her application and her testimony were inconsistent as to whether the police were contacted.

Tchernycheva also alleged that, in February 1998, four men beat her husband at a train station for proselytizing their religion, although she was not there. Koulikov testified that the four men were RNU members and that they kicked him with steel-toed boots, resulting in a leg injury. When he went to the police station to complain, he claimed that his attackers were there with the police, talking about beating him and laughing. The IJ was, again, not moved by this claim. Tchernycheva was not an eye witness, there was no evidence that the beating had anything to do with her, Koulikov's asylum claim was derivative of hers, and he had not mentioned any specific incident in his separate I-589 application. Moreover, the mere fact they were married (which, we note, they were not at that time or until, at the earliest, July 30, 2000) was not enough to

4

convince the IJ that an assault against him should be considered a threat against her.

Tchernycheva claimed, next, that she and her fellow Baptists held a religious concert in a park in a small village in the summer of 1998. Although the group had been permitted to hold concerts in previous years, that year they were dispersed by the police and told to leave town because they were "not allowed to . . . brainwash the people of [the] village [with their] sectarian ideas." App. 152. The IJ found that this "one time" interruption of a concert with no evidence of any physical assault was not persecution. But, said Tchernycheva, after leaving the park and going to the home of a church member, a group of Orthodox people gathered, shouting slurs and throwing stones and bottles. She claimed that she and her fellow Baptists called the police a few times, and the police said, "[W]e warn you, if you don't want any problems, get out of here." App. 156. No calls to the police, much less any warnings, were mentioned in her asylum application, nor was any refusal of the police to come to the group's aid. When the group went to the train station after things had quieted down, they were attacked by the people that had attacked the church member's home. Tchernycheva was struck on her nose, lost consciousness, and "came to" in the hospital. App. 156-57, 619. The IJ, in her Opinion, went through this chronology in detail and found it important that, in three respects, Tchernycheva's testimony as to the incident added facts to those mentioned in her asylum application.[3] The IJ was "worrie[d]" that Tchernycheva "seems to have developed a habit

_____

[3] We disagree as to one of the purported additions. The IJ found that the asylum application suggested that Tchernycheva was never unconscious at the scene, which, if

5

now with three specific examples of things that have been added in the in-Court testimony, of trying to enhance or improve her case during the course of testimony before the Court." App. 64.

Tchernycheva next described an incident in April 1999, when she and Koulikov went to check on "Luba," a young woman whom they had encouraged to come to their religious meetings but had stopped doing so and whom they were trying to bring back. Luba's father hit Koulikov in the face and threatened petitioners with harm if they did not leave Luba alone. Petitioners did not go to the police. The IJ was "absolutely certain" that this incident of a father protecting his daughter from people that he felt were brainwashing his daughter "does not even come close to a hint of persecution," and that if there was any persecution, it was not of petitioners but was of Luba by her father because she was trying to practice her faith. App. 64, 66. And, as the IJ somewhat pithily observed, "the relationship between Luba and her dad is none of their business" and petitioners' "outrageous insensitivity" to that relationship is "some evidence of their inability to think clearly." App. 66.

Tchernycheva claimed, as well, that she appeared with other Baptists on a television show called "Fresh Wind" in December 2000. As a result of this appearance,

---

true, would be contrary to her testimony. The application, however, stated that Tchernycheva fell "because of feeling faint" and that when she "awoke," she and three of her group "were taken" to the hospital. App. 619. "Awoke" suggests that she was unconscious at some point at the scene. That having been said, it appears from the application that she "came to" before she was taken to the hospital, and not, as she testified, in the hospital.

she was fired from her job and received threatening phone calls. Tchernycheva, said the IJ, was "simply not clear about what on earth she was saying" during the TV broadcast or "what she was actually complaining about." App. 69-70. The IJ found it important that her trial testimony was, again, "vastly different" from what she said in her asylum application and "completely changed" during the testimony itself. Id. In any event, concluded the IJ, even if "anyone can figure out what on earth "[she] was saying," the employer is not a persecutor because he fired her. App. 70.

Next, according to Tchernycheva, RNU members attacked her and her group, including Koulikov, when they were returning from a missionary visit to a hospital in July 2001. The assailants called Koulikov an "oriental eye[d] degenerate[]" as they beat him. App. 171, 620. Although Tchernycheva claimed in her asylum application that they were accosted because they were Baptists, during her testimony she claimed that Koulikov was attacked because he does not look Russian. She claims to have reported the incident to the police, and that the police did not help them. Again, her report to the police was not mentioned in her asylum application, a fact for which the IJ found there was no satisfactory explanation. The IJ found, as well, that there was no evidence that the group was doing anything "religious" or identifying themselves with their religion when they were attacked. App. 72.

Tchernycheva also alleged that, in February 2002, she and Koulikov were inserting religious literature into the newspapers they were distributing. The police told them that

7

there had been complaints about the religious literature, and took petitioners to the police station. Koulikov was beaten with a rubber baton, and they were held for twelve hours before being released. As the IJ found, there was nothing in Koulikov's I-589 application to support any claim that he could make and no evidence that the police participated in any subsequent activities against either or both of petitioners or ever again detained them and, thus, no evidence that Tchernycheva would have a fear of persecution at the hands of the police because, on that one occasion, her husband was assaulted.

Tchernycheva next claimed that, in March 2002, while returning by car with Koulikov and others after proselytizing their religion in Osprob, they were followed by a car which ran them off the road, injuring them. The occupants of the other car were screaming and gesturing, but she could not identify them or hear what they were saying, although Koulikov claims to have seen and heard virtually everything. The IJ found this "not understandable" and not consistent with Tchernycheva's asylum application. App. 75. Indeed, the IJ was not convinced that this incident had even taken place. We note that it is problematical, to say the least, that in the course of being forced off the road by another car, which apparently at high speed hit petitioners' car three times, Koulikov distinctly heard the occupants of the other car say, "We are the members of RNU, we finally got our hands on you. The power is with us, and now this is going to be the end of you for a fact." App. 302.

**II.**

After hearing extensive testimony, the IJ, in a thirty-seven page opinion, denied petitioners' applications, and the BIA adopted and affirmed that decision, dismissing the appeal. We have jurisdiction over this petition for review under 8 U.S.C. § 1252. Where the BIA adopts an IJ's decision, we review the IJ's decision as if it were that of the BIA. See Obale v. Att'y Gen., 453 F.3d 151, 161 (3d Cir. 2006). Where, however, the BIA adds its own analysis, we review both decisions. Fiadjoe v. Att'y Gen., 411 F.3d 135, 153 (3d Cir. 2005). Adverse credibility determinations are reviewed under the substantial evidence standard, as are the IJ's other findings of fact. Id. We will find that substantial evidence supports the IJ's conclusions unless "any reasonable adjudicator would be compelled to conclude to the contrary." Obale, 453 F.3d at 161 (quoting Zheng v. Gonzales, 417 F.3d 379, 381 (3d Cir. 2005)). We exercise plenary review over questions of law. Jeune v. Att'y Gen., 476 F.3d 199, 201 (3d Cir. 2007).

We have attempted, in our discussion of the facts, to incorporate some of the problems to which the IJ pointed in her Opinion, and we will not reprise them here. Suffice it to say, the IJ was particularly disturbed by what she found to be Tchernycheva's proclivity in her testimony to embellish the facts set forth in her asylum application and add new facts to "enhance or improve her case." App. 63-64. The IJ was also "absolutely startled and shocked" by Tchernychova's "complete lack of knowledge" that there are registered places to worship in her faith; her lack of knowledge is "appalling," and cast

9

"complete doubt" on her claim that she even practiced the Baptist faith in Russia. App. 76-77. "None of the events" that Tchernycheva set forth, the IJ concluded, constitute past persecution and there is "no evidence" that she will not be able to practice her faith in Russia. App. at 77-78.

Petitioners assert three errors on the part of the IJ. They claim, first, that a remand is mandatory because the IJ failed to forward to the State Department a copy of Tchernycheva's asylum application, as required by 8 C.F.R. § 1208.11(a).[4] They claim, next, that the IJ made what petitioners describe as an unwarranted "negative credibility finding" because only "details" were added by Tchernycheva to her asylum application and the discrepancies and inconsistencies to which the IJ referred do not exist. Finally, they argue that a reasonable factfinder would have been compelled to conclude that the facts of this case amounted to persecution and created a well-founded fear of future persecution.[5]

We lack jurisdiction to consider the § 1208.11(a) claim because petitioners did not raise it on appeal to the BIA. 8 U.S.C. § 1252(d)(1); see also Kibinda v. Att'y Gen., 477

---

[4]  This section provides that: "The Service shall forward to the Department of State a copy of each completed application it receives." The State Department then may provide, at its option, a report detailing country conditions relevant to the application. 8 C.F.R. § 1208.11(a).

[5]  Petitioners do not press before us a claim based on Koulikov's Chuvash (variously spelled in the record) ethnicity or a claim that there exists a pattern or practice of persecution against Baptists in Russia.

F.3d 113, 120 n.8 (3d Cir. 2007) (requiring a petitioner to raise and exhaust his or her remedies as to each claim or ground for relief in order to preserve that claim for appeal).

Next, we reject, with almost as little discussion given our fairly lengthy discussion at the outset, petitioners' claim that Tchernycheva was not deserving of a "negative credibility finding." Petitioners mention, in support of this claim, two of the incidents that the IJ found were not included in Tchernycheva's asylum application and the IJ's finding that she had "no inkling" about the registration of religious organizations. Without pausing to parse those two incidents more than we have already done, we simply note that the IJ identified numerous other omissions from Tchernycheva's asylum application and inconsistencies even within her own testimony, with the TV broadcast the paradigmic example. And, of course, it is absolutely clear from her testimony that she did not even know there was a difference between registered and unregistered religious organizations.

A petitioner's credibility "does not necessarily rise or fall on each element of [her] testimony," but is determined on "the cumulative effect of the entirety of all such elements." Jishiashvili v. Att'y Gen., 402 F.3d 386, 396 (3d Cir. 2005). The IJ, without using the phrase "adverse credibility determination," found that a pattern of embellishment, a host of inconsistencies, and a lack of knowledge of a fact that one making a faith-based claim would have had to have known undermined Tchernycheva's credibility. The BIA, also without using that phrase, concluded as follows:

11

> The Immigration Judge identified a series of reasons to be suspicious of the [petitioners'] account of past persecution and mistreatment. No single concern would lead us to conclude that the [petitioners'] story is untrue. However, the constellation of problems described by the Immigration Judge lead us to agree that the [petitioners] have not met their burden of proof to establish eligibility for the requested forms of relief.

App. 2. Because a reasonable factfinder would not be compelled to decide otherwise, we conclude that there was substantial evidence to support the "negative credibility finding."

Finally, credibility aside, we disagree with petitioners that a reasonable factfinder would have been compelled to conclude that the incidents to which they testified amounted to persecution and would create a well-founded fear of future persecution. Petitioners rely mainly on the cumulative effects analysis employed by the Second Circuit in Poradisova v. Gonzales, 420 F.3d 70 (2d Cir. 2005), and claim that the IJ incorrectly viewed the various incidents in isolation minimizing, in the process, the "harassment and mistreatment" they suffered as Baptists. We will not pause to distinguish Poradisova from this case. We simply conclude that whether the various incidents are considered separately or together, a reasonable factfinder would not have been compelled to find persecution or a well-founded fear of future persecution.

The petition for review will be denied.