*Shuqiang Tian v. Bondi*

# United States Court of Appeals

# For the Second Circuit

August Term 2024

Submitted:  November 27, 2024
Decided:  March 5, 2025

No. 22-6053

SHUQIANG TIAN,

*Petitioner*,

*v.*

PAMELA BONDI,[*] UNITED STATES ATTORNEY GENERAL,

*Respondent*.

Appeal from the Board of Immigration Appeals

*In re Shuqiang Tian*, No. A208-092-081
(B.I.A. Jan. 6, 2022)

Before:      CALABRESI, MERRIAM, *Circuit Judges*, and RAKOFF, *District Judge*. [**]

---

[*] The Clerk of the Court is directed to substitute Attorney General Bondi for the named respondent, former Attorney General Merrick Garland, pursuant to Federal Rule of Appellate Procedure 43(c)(2).

[**] Judge Jed S. Rakoff, United States District Judge for the Southern District of New York, sitting by designation.

Petitioner Shuqiang Tian ("Tian"), a native and citizen of the People's Republic of China ("China"), seeks review of a January 6, 2022, decision of the Board of Immigration Appeals (the "Board" or "BIA"), affirming and adopting an April 19, 2019, order of an Immigration Judge ("IJ") denying Tian's claims for asylum, withholding of removal, and protection under the regulations implementing the Convention Against Torture ("CAT"). The IJ and BIA (collectively, the "agency") denied Tian's claims for asylum and statutory withholding of removal because Tian failed to show that the harm he suffered or feared was because of his political opinion. As for the CAT claim, the agency summarily concluded that the evidence did not establish that it is more likely than not that Tian would be tortured with the acquiescence of the government if removed to China. We **GRANT** the petition, **VACATE** the decision of the BIA, and **REMAND** the case for reconsideration of Tian's claims because the agency failed to consider material evidence bearing on Tian's claims for asylum and withholding of removal and failed to state meaningful reasons for its denial of Tian's CAT claim.

Troy Nader Moslemi Esq., Flushing, NY, *for Petitioner.*

Brian Boynton, Principal Deputy Assistant Attorney General; Jessica E. Burns, Senior Litigation Counsel; Scott M. Marconda, Senior Trial Attorney, Office of Immigration Litigation, Civil Division, United States Department of Justice, *for Respondent.*

JED S. RAKOFF, *District Judge*:

I.    **Background**

A.    **Tian's Claim of Persecution**

Tian arrived in the United States on September 11, 2014, on a temporary business visa. Five months later, on February 18, 2015, Tian applied for asylum,

withholding of removal, and protection under the CAT, claiming that he had been persecuted by the Chinese government because of his opposition to that government's "forcible demolition" policy by which villagers' homes are demolished without just compensation. Certified Administrative Record ("CAR") at 201. Tian testified before the IJ in support of his application and, importantly, the IJ fully credited his testimony. Specifically, Tian testified that before arriving in the United States, he and his family, who were farmers, resided in a home in a rural area of China known as Rujiang Village, in Fujian Province. On March 10, 2011, representatives of the Chinese government notified Tian and other residents of Rujiang that they intended to demolish their houses to develop new housing on the village land. Initially, the government offered to compensate those villagers who possessed deeds to their houses at 100% of the value of each house built before 1990 and 70% for each house built after 1990. However, because Tian, like most villagers, did not possess a "title-deed" to his house, he was offered only 50% compensation. CAR at 208. After most such villagers, including Tian, refused the 50% offer, the government increased the offer for houses without deeds to 70% of the value, but Tian and many others still did not accept the offer. Those villagers who did accept, including Tian's immediately adjacent neighbors, received notices

from the government that their homes would be demolished on May 10, 2011. Most of the houses in the village were "attached" and not stand-alone houses, which meant that the demolition would impact not only the houses of the villagers who accepted the offers but also many of those who did not.

On the day of the demolition, Tian and others who refused the offers protested the "unreasonable demolition" and barricaded a road to prevent the demolition team from reaching the village. CAR at 74–75. In his submission to the IJ, Tian provided photographs of two of the banners that the villagers held up during the protest, which read (in translation): "Fair and Just, Cancel the Agreement of Demolition and Relocation; Return Us Our Contracts; Return Us the Land; Return Us the Transitional Allowance; Give Us the Justice, Give Us the Fairness!" and "By Justice, By principle; Return Us Our Land, Return Us Our Homes; Annul the Agreement and Return the Contract; Where is the Truth? Stop Forcible Demolition and Savage Actions in Rujiang; Demanding the District Government to Provide Us a Solution! From all people of one mind, 2012." CAR at 190. The police officers dispersed the protesters with shields and beat them with batons. They then arrested Tian and twelve other protesters and brought them to the local police station where they "educated" them that the protest was "illegal"

4

and "violated the . . . national interest." CAR at 77. Tian testified that protesting was not illegal under Chinese law, but admitted that barricading the village road was. Eventually, Tian was released, but only after signing a document in which he promised that he would not participate in similar protests in the future.

After his release, the government representatives visited Tian at his home and told him that if he now accepted the government's offer, he would be paid 70% of his house's value within a month of acceptance, but if he refused to sign, not only would he receive nothing, but also his family would be faced with the prospect of being "broken" and that "people may die." CAR at 80. Under this duress, Tian signed the offer and agreed to move out on or about May 23, 2011. However, even though the government then demolished Tian's home, the promised compensation never came. Further, while Tian built a shelter out of wood to house him and his family, the government eventually cut off the supply of utilities to the shelter.

After three years had passed following the demolition and Tian still had not received any compensation, he went to the Office of Demolition and Relocation to inquire about the promised financial compensation and accused the government of corruption and "gang[ing] up with [the] merchants." CAR at 209. The

government workers at the office called the police, who then handcuffed Tian and escorted him to the police station where he was interrogated about why he made "trouble at the Government office." CAR at 88. The police officers told him to kneel and proceeded to kick him in the lower back, in the face, and on his head, which caused him swelling, bleeding, and eardrum perforation, as corroborated by medical records from Tian's visit to a doctor the next day. Before releasing him, the police warned Tian not to "cause more trouble" because if he did, he would face more severe consequences in the future. CAR at 209. Tian's family was not resettled to new housing until May 2018.

### B. Proceedings Before the Agency

Following an evidentiary hearing, the IJ issued an oral decision denying Tian's petition. *See In re Shuqiang Tian*, No. A208-092-081 (Immigr. Ct. N.Y. City Apr. 19, 2019). In that decision, the IJ concluded that such "prosecution as occurred here is not necessarily persecution" because Tian engaged in concededly illegal acts of blocking a village road and agitating in a government office. CAR at 53. According to the IJ, Tian had failed to demonstrate a sufficient nexus between the exercise of his opposition to the demolition program and the harms he suffered, let alone an adequate basis for fearing he would suffer further harms if he were

6

removed to China. On such grounds, the IJ also denied Tian's application for withholding of removal, which requires a less stringent burden of proof than asylum. As for Tian's CAT claim, the IJ summarily concluded that Tian had not suffered "torture within the meaning of the regulations" and that he failed to establish that he was more likely than not to face torture upon return to China. CAR at 54.

On January 6, 2022, in a two-page opinion, the BIA adopted and affirmed the IJ's decision and dismissed Tian's petition. *See In re Shuqiang Tian*, No. A208-092-081 (B.I.A. Jan. 6, 2022). The BIA concluded that Tian had not only failed to demonstrate past persecution but had also failed to show that any protected ground "was or would be a central reason for his fear of harm at the hands of the government officials, who demolished his home for economic development purposes[.]" CAR at 3. The Board likewise affirmed the IJ's denial of protections under the regulations implementing CAT, finding that Tian had failed to establish either that he had experienced torture in the past or that the government would acquiesce in future torture. Pursuant to 8 U.S.C. § 1252, Tian filed this timely petition from the BIA's decision denying his application.

**II.      Discussion**

While the severity of Tian's claims pales in comparison with many asylum requests, we are constrained to conclude that the agency's analysis of his claims was legally deficient. In this regard, we have considered both the IJ's and the BIA's opinions "for the sake of completeness." *Wangchuck v. Dep't of Homeland Sec.*, 448 F.3d 524, 528 (2d Cir. 2006). We review the agency's factual findings for substantial evidence, reversing only if "any reasonable adjudicator would be compelled to conclude to the contrary." *Dedji v. Mukasey*, 525 F.3d 187, 191 (2d Cir. 2008) (quoting 8 U.S.C. § 1252(b)(4)(B)). However, "[d]espite our generally deferential review of IJ and BIA opinions, we require a certain minimum level of analysis from the IJ and BIA" to allow for meaningful judicial review, as well as "some indication that the IJ considered material evidence supporting a petitioner's claim." *Poradisova v. Gonzales*, 420 F.3d 70, 77 (2d Cir. 2005). "We will vacate and remand for new findings . . . if the agency's reasoning or its factfinding process was sufficiently flawed." *Xiao Kui Lin v. Mukasey*, 553 F.3d 217, 220 (2d Cir. 2009).

**A.      Asylum and Withholding of Removal**

An applicant for asylum or withholding of removal must establish that because of a protected ground—here, "political opinion"—he has suffered past

persecution, or has a well-founded fear or likelihood of future persecution. 8 U.S.C. §§ 1101(a)(42)(A), 1158(b)(1)(A) (asylum); 8 U.S.C. § 1231(b)(3)(A) (withholding of removal). "To establish persecution 'on account of' political opinion . . . , an asylum applicant must demonstrate that the persecution arises from his own political opinion, actual or imputed." *Rodas Castro v. Holder*, 597 F.3d 93, 100 (2d Cir. 2010). "The important questions for determining the nature of the applicant's opposition are whether the applicant's actions were directed toward a governing institution, or only against individuals whose corruption was aberrational, and whether the persecutor was attempting to suppress a challenge to the governing institution[.]" *Yueqing Zhang v. Gonzales*, 426 F.3d 540, 548 (2d Cir. 2005) (citation and quotation marks omitted). "Answering these questions necessarily involves a 'complex and contextual factual inquiry' into the nature of the asylum applicant's activities in relation to the political context in which the dispute took place." *Rodas Castro*, 597 F.3d at 101 (quoting *Yueqing Zhang,* 426 F.3d at 548). Finally, "[i]n cases where there is more than one motive for mistreatment (also known as mixed-motive cases) . . . [the protected ground] must be at least one of the central reasons, rather than a minor reason, for

9

why that individual is being targeted." *Garcia-Aranda v. Garland*, 53 F.4th 752, 757 (2d Cir. 2022); *see also Quituizaca v. Garland*, 52 F.4th 103, 107–14 (2d Cir. 2022).

Tian asserts that he was persecuted based on a protected ground, specifically, his political opinion. The political opinion that Tian repeatedly and openly expressed to government officials was the same basic principle enshrined in our Fifth Amendment: "nor shall private property be taken for public use, without just compensation." U.S. CONST. amend. V. The IJ credited Tian's testimony that after he repeatedly expressed that opinion, he was not only arrested but also was threatened and eventually assaulted. Nonetheless, the IJ concluded that Tian failed to show that the harm he experienced was "on account of" his political opinion. CAR at 53. According to the IJ, this was because, on the one hand, the Chinese government indicated its substantial agreement with Tian's opinion by offering him partial compensation for harm to a property to which Tian did not even possess a deed, and, on the other hand, because the immediate precursors to Tian's being threatened and then assaulted were his arrests for blocking a public road and for disrupting a public office.

However, even assuming *arguendo* that the arrests were legitimate and preceded the threats and assaults, we have held that "the persecutor's motive need

10

not be *solely* to overcome the applicant's political opinion," *Yueqing Zhang*, 426 F.3d at 548. And here it was clear from Tian's credited testimony that the threats and assaults were closely linked to Tian's vigorous expression of his opposition to the government's demolition policy. Thus, in the case of his first arrest, Tian's release was expressly conditioned upon signing an agreement that he would no longer participate in protests against the government's demolition policy. His subsequent signing of a partial compensation offer that he had previously opposed was then achieved by the government's telling him that if he refused to sign, his family may be "broken" and "people may die." CAR at 80. And finally, the disruption of the government office that led to the second arrest and accompanying physical assault immediately followed his assertion of his right to the promised compensation and his railing against the government's alleged corruption in carrying out the demolition policy. It thus seems highly likely that a major motive for Tian's arrests and for the threats made to him and assaults visited upon him was his vigorous expression of his political opinion; but despite our holdings in *Garcia-Aranda* and *Yueqing Zhang*, *supra*, the IJ effectively ignored this possibility.

Further, Tian's testimony is consistent with other evidence he introduced that Chinese government officials often illegally detain those who try to lodge

11

complaints concerning the government's land takings, that the government frequently ignores petitioners' concerns and "round[s] [them] up," that "re-education" is a "common punishment for would-be petitioners," that this system is used to "silence government critics," and that the government has violently suppressed largescale protests over the forced demolition and expropriation in rural China. CAR at 193–94. There is no indication that the agency considered any of this evidence at all. *Cf. Poradisova*, 420 F.3d at 81 ("IJs and the BIA have a duty to explicitly consider any country conditions evidence submitted by an applicant that materially bears on his claim.").

We conclude that the agency's failure to consider both the obvious context of Tian's protests and the credited evidence of the government's retaliation for that expression through prosecution and persecution was erroneous.

The agency also failed to consider several facts indicating that the arrests may have been pretextual. *See Jin Jin Long v. Holder*, 620 F.3d 162, 166 (2d Cir. 2010) ("[P]rosecution that is pretext for political persecution is not on account of law enforcement."). After arresting Tian purportedly for blocking the village road, the government never formally charged him with any crime or brought him before a judge. Instead, the police officers "educated" Tian about the "national interest"

12

and conditioned his release upon Tian agreeing that he would not engage in further protests of any kind. CAR at 77; *cf. Jin Jin Long*, 620 F.3d at 167. Similarly, it is unclear what legal infraction, if any, Tian committed that precipitated his arrest after he accused the government of corruption at the Office of Demolition and Relocation. Despite the apparent lack of formal charges, the police detained Tian and severely beat him. *See, e.g.*, *Vumi v. Gonzales*, 502 F.3d 150, 158 (2d Cir. 2007) (holding that "interrogation and punishment" that is "disproportionate to the crime . . . would indicate persecution on grounds of political opinion rather than prosecution or legitimate law-enforcement interrogation") (citation and quotation marks omitted). In short, we find that the agency further erred because it failed to consider whether the cumulative facts support an inference that Tian's arrest and detention were pretextual.

Finally, the agency's focus on the fact that Tian was offered (partial) compensation, while failing to examine the context or the nature of Tian's opposition to the government's demolition policy, is also an error. Regardless of any partial benefit Tian stood to receive, the evidence discussed above suggests, at the very least, that his actions "transcend[ed] mere self-protection and represent[ed] a challenge to the legitimacy or authority of the ruling regime[,]"

13

*Yueqing Zhang*, 426 F.3d at 548, and that the government attempted to suppress those challenges. Instead of engaging with the relevant contextual evidence, the agency fixated on the fact that Tian did not "hold evidence of legal possession" to his house. CAR at 53. Whether or not Tian held a deed has little relevance to whether the Chinese government's response to Tian's protests amounted to persecution on account of political opinion.

**B.      CAT Relief**

On appeal, Tian also challenges the agency's denial of relief under the regulations implementing the CAT. To obtain CAT relief, a non-citizen must show that it is "more likely than not" that he would be tortured if removed to the proposed country of removal. 8 C.F.R. § 1208.16(c)(2). CAT relief does not require a nexus between the alleged torture and a protected ground. *See Garcia-Aranda*, 53 F.4th at 758. And "torture" is defined as "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person . . . by, or at the instigation of, or with the consent or acquiescence of, a public official acting in an official capacity or other person acting in an official capacity." 8 C.F.R. § 1208.18(a)(1). Tian presented oral testimony and medical evidence that he was severely beaten by the police officers while made to kneel. The beating made

14

him swollen and dizzy, and caused him to bleed and suffer permanent hearing loss. Without engaging with *any* facts in the record or referencing any precedent, the IJ summarily concluded that Tian "did not suffer torture within the meaning of the [CAT] regulations." CAR at 54. In a conclusion devoid of any reasoning, the BIA then affirmed that Tian "did not experience mistreatment rising to the level of torture" and added that he "cannot met [*sic*] his burden of proof based on a string of suppositions that he will be targeted for torture, and that authorities would acquiesce or turn a blind eye to such harm." CAR at 4. The agency left us with no reasoned basis upon which we can evaluate its decision and, further, gave us no "indication" that it "considered material evidence supporting a petitioner's claim." *Poradisova*, 420 F.3d at 77. As we have held before, "failure to consider material evidence in the record is ground for remand." *Delgado v. Mukasey*, 508 F.3d 702, 709 (2d Cir. 2007); *see also Scarlett v. Barr*, 957 F.3d 316, 329–31 (2d Cir. 2020) (remanding where the agency did not appear to give reasoned consideration to all relevant evidence).

For the foregoing reasons, the petition for review is **GRANTED** and the BIA's decision rejecting Tian's claims for asylum, withholding of removal, and CAT is **VACATED**. This matter is **REMANDED** to the BIA for further

15

consideration consistent with this opinion. All pending motions and applications are **DENIED** and stays **VACATED**.